SPENCER PERSSON (SBN 235054)
spersson@bakerlaw.com
ALEXANDER VITRUK (SBN 315756)
avitruk@bakerlaw.com
**BAKER & HOSTETLER LLP**
1900 Avenue of the Stars, Suite 2700
Los Angeles, CA 90067-4301
Telephone: 310.820.8800
Facsimile: 310.820.8859

*Attorneys for Defendants*



**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KRISTIN BAKER and STACY PENNING, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HEALTHY WEB, INC. and NATURAL PARTNERS, INC., d/b/a FULLSCRIPT,<br><br>Defendants. | Case No.:<br><br>[Los Angeles County Superior Court Case No.: 26STCV13931]<br><br>**DEFENDANTS' NOTICE OF REMOVAL**<br><br>Action Filed: April 30, 2026<br>Action Removed: June 5, 2026 |

Pursuant to 28 U.S.C. §§ 1332(d), 1441, 1446, and 1453, Defendants Healthy Web, Inc. and Natural Partners, Inc., d/b/a Fullscript (together, "Fullscript" or "Defendant") hereby remove this action filed by Plaintiffs Kristin Baker and Stacy Penning ("Plaintiffs"), on behalf of themselves and all others similarly situated, from Los Angeles County Superior Court of California, Case No. 26STCV13931, to the U.S. District Court for the Central District of California, Western Division. The grounds for removal follow.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

## I. JURISDICTION AND VENUE

1. This is a civil action over which the Court has original subject matter jurisdiction under 28 U.S.C. §§ 1332 and 1441. Removal is proper under the Class Action Fairness Act of 2005 ("CAFA"), codified in pertinent part at 28 U.S.C. § 1332(d).

2. This Court is in the judicial district in the place where the state court case was brought and is pending. Thus, this Court is the proper district to which this case should be removed. 28 U.S.C. §§ 1441(a), 1446(a).

## II. BACKGROUND AND TIMELINESS OF REMOVAL

3. On April 30, 2026, Plaintiffs, on behalf of themselves and, purportedly, on behalf of others similarly situated, filed a Class Action Complaint ("Complaint") against Fullscript in Los Angeles County Superior Court, Case No. 26STCV13931 ("State Court Action"). Plaintiffs filed this complaint as a putative class action.

4. On May 6, 2026, Plaintiffs served Fullscript with copies of the Summons, Complaint, and Civil Case Cover Sheet. Pursuant to 28 U.S.C. § 1446(a), true and correct copies of the documents Fullscript has received in the State Court Action are attached hereto as exhibits. Specifically, attached to this Notice of Removal are true and correct copies of: (1) Case Information Cover Sheet (**Exhibit 1**); (2) Summons (**Exhibit 2**); (3) Notice of Case Assignment (**Exhibit 3**); (4) Complaint (**Exhibit 4**); (5) Civil Case Cover Sheet (**Exhibit 5**); (6) Civil Case Cover Sheet (**Exhibit 6**); (7) Alternative Dispute Resolution Packet (**Exhibit 7**); (8) Minute

Order (Court Order Scheduling Initial Status Conference) (**Exhibit 8**); (9) Initial Status Conference Order (**Exhibit 9**); (10) Clerk's Certificate of Service by Electronic Service (**Exhibit 10**); (11) Affidavit of Service Summons Complaint (**Exhibit 11**).

5. No other pleadings or documents (*i.e.* answers, other state court orders terminating or dismissing parties, responses, etc.) have been filed in the State Court Action.

6. This removal is timely because Fullscript filed this removal on or before 30 days after being served with the Complaint. 28 U.S.C. § 1446(b)(1) (notice of removal shall be filed within 30 days of service); *Garcia v. Wal-Mart Stores Inc.*, 207 F. Supp. 3d 1114, 1119 (C.D. Cal. 2016) (clock for removal begins when the defendant is served).

7. No previous notice of removal has been filed in this action.

8. All co-defendants who have been properly joined and served with state-court process consent to removal under 28 U.S.C. § 1446(b)(2)(A).

## III. CAFA JURISDICTION

9. Basis of Original Jurisdiction. This Court has original jurisdiction over this action under CAFA, 28 U.S.C. § 1332(d). Section 1332(d) provides that a district court shall have original jurisdiction over a class action with 100 or more putative class members, in which the amount in controversy, in the aggregate, exceeds the sum or value of $5,000,000, and any member of the putative class is a citizen of a



BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

different state than the state of citizenship of the defendant. 28 U.S.C. § 1332(d)(1)–(2)(a); *Ibarra v. Manheim Invs., Inc.*, 775 F.3d 1193, 1195 (9th Cir. 2015).

10. As set forth below, pursuant to 28 U.S.C. §§ 1332(d) and 1441(a), Fullscript may remove the State Court Action to this Court under CAFA because: (A) this action is pled as a class action; (B) the putative class includes more than 100 putative class members; (C) one or more members of the putative class are citizens of a state different from that of Defendants; and (D) the amount in controversy, in the aggregate, exceeds the sum or value of $5,000,000, exclusive of interest and costs.

**A. <u>This Action is Pled as a Class Action.</u>**

11. CAFA defines a putative "class action" as "any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar state statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action." 28 U.S.C. § 1332(d)(1)(B).

12. Plaintiffs bring this action as a putative "class action" pursuant to Cal. Civ. Proc. § 382 and identify a putative class (the "Class").

13. Therefore, the Complaint constitutes a putative class action under CAFA 28 § 1332(d)(1)(B).

**B. <u>The Putative Class Contains At Least 100 Members.</u>**

14. Plaintiffs bring the following five claims against Fullscript: (1) violation of the California Invasion of Privacy Act ("CIPA"), Cal. Pen. Code § 631; (2) violation of CIPA, Cal. Pen. Code § 632; (3) violation of CIPA, Cal. Pen. Code §

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

638.51 *et seq.*; (4) breach of contract; (5) violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*. *See* Compl. ¶¶ 116–166.

15. Specifically, Plaintiffs allege that Fullscript owns and operates fullscript.com, a platform on which patients may purchase health supplements. *Id.* ¶ 3.

16. Plaintiff Kristin Baker alleges that she used Fullscript's website to browse for and order health supplements. *Id.* ¶ 13.

17. Plaintiff Stacy Penning alleges he used Fullscript's website to "view[]" various health supplement products. *Id.* ¶ 14.

18. Plaintiffs allege Fullscript placed cookies and tracking technologies from multiple third parties on its website, allowing the third parties to acquire patients' information for advertising and functional purposes. *Id.* ¶ 2.

19. Plaintiffs further allege that Fullscript's "cookie consent banner," which allows patients to decline all optional cookies and tracking technologies, does not, in fact, remove said cookies and technologies from the website or block them from sharing data with third parties. *Id.* ¶¶ 4, 7.

20. Plaintiffs purport to bring this class action on behalf of "All California [*sic*] who declined consent to optional cookies and other tracking technologies via Defendant's cookie banner and whose information was disclosed by Defendant to Third Parties." Compl. ¶ 106.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

21. Fullscript denies and each and every allegation of unlawful conduct and will defend itself vigorously against each cause of action. However, for the purposes of calculating class size, based on Fullscript's preliminary review of its records, during the past year alone, 423,104 California based users visited fullscript.com. While Fullscript does not currently have California-specific data regarding cookie preferences, if only 1% of the 423,104 California users declined optional cookies and tracking technologies, the putative class would include approximately 4,231 individuals. Fullscript's records show that more than 1% nationwide did not affirmatively consent to cookies and tracking technologies.

22. Therefore, the number of putative Class members exceeds the statutorily required minimum of 100 individuals.

**D. <u>Minimum Diversity of Citizenship Exists.</u>**

23. Pursuant to 28 U.S.C. § 1332(d)(2)(A), the "district court shall have original jurisdiction" over a "class in which . . . *any member of the class of plaintiffs* is a citizen of a State different from *any defendant*." (emphasis added); *see also Singh v. Am. Honda Fin. Corp.*, 925 F.3d 1053, 1063 (9th Cir. 2019) (CAFA jurisdiction assessed "at the time of removal"); *Bush v. Cheaptickets, Inc.*, 425 F.3d 683, 684 (9th Cir. 2005) (minimal diversity met where at least one member of the putative class is diverse from at least one defendant).

24. <u>Defendant Healthy Web, Inc.'s Citizenship.</u> Defendant Healthy Web Inc., d/b/a Fullscript is a Delaware corporation with its principal place of business in

Scottsdale, Arizona. Compl. ¶ 15. For purposes of diversity jurisdiction, "a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business." 28 U.S.C. § 1332(c)(1). Thus, Defendant is a citizen of the State of Delaware and the State of Arizona because it is incorporated under the laws of Delaware and has its principal place of business in Arizona.

25. Defendant Natural Partners, Inc.'s Citizenship. Defendant Natural Partners, Inc., d/b/a Fullscript is a Delaware corporation with its principal place of business in Scottsdale, Arizona. Compl. ¶ 16. For purposes of diversity jurisdiction, "a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business." 28 U.S.C. § 1332(c)(1). Thus, Defendant is a citizen of the State of Delaware and the State of Arizona because it is incorporated under the laws of Delaware and has its principal place of business in Arizona.

26. Plaintiffs' Citizenship. Plaintiff Kristin Baker and Plaintiff Stacy Penning are citizens of California. Compl. ¶¶ 13–14.

27. The Putative Class's Citizenship. Plaintiff seeks to represent a class of individuals from California; however, the Complaint does not make clear whether those are residents of California, citizens, or individuals who were merely present in California at the time they accessed the website. Compl. ¶ 106.

28. Regardless, because at least one defendant and one member of the putative class (in this case, the named plaintiffs) are citizens of different states, CAFA's minimal diversity requirement is met. *See* 28 U.S.C. § 1332(d)(2)(A).

**D. The CAFA Amount in Controversy is Satisfied.**[1]

29. Plaintiff's Complaint also meets CAFA's requirement that the amount in controversy exceeds $5,000,000. *See* 28 U.S.C. § 1332(d)(2).

30. Plaintiffs' Complaint does not allege the amount in controversy for the class they purport to represent. Where a complaint does not allege a specific amount in damages, the "defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014). Defendant may rely on "reasonable assumptions" in calculating the amount in controversy for removal purposes. *Arias v. Residence Inn by Marriott*, 936 F.3d 920, 922 (9th Cir. 2019).

31. Additionally, the "amount in controversy is the 'amount at stake in the underlying litigation.'" *Greene v. Harley-Davidson, Inc.*, 965 F.3d 767, 772 (9th Cir. 2020) (quoting *Gonzales v. CarMax Auto Superstores, LLC*, 840 F.3d 644, 648 (9th Cir. 2016)). "'Amount at stake' does not mean likely or probable liability; rather, it

[1] The amounts set forth in this Notice of Removal are solely for purposes of establishing that the amount in controversy exceeds the $5,000,000 threshold and are not intended and cannot be construed as an admission that Plaintiffs can state a claim or are entitled to damages in any amount. Defendant denies liability, denies Plaintiffs are entitled to recover any amount, and denies that a class can be properly certified in this matter.



BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

refers to possible liability." *Id.* In assessing the amount in controversy, a court must "assume that the allegations in the Complaint are true and assume that a jury will return a verdict for the plaintiff on all claims made in the Complaint." *Campbell v. Vitran Exp., Inc.*, 471 Fed.Appx. 646, 648 (9th Cir. 2012).

32. As demonstrated below, the allegations in the Complaint make it more likely than not that the amount in controversy exceeds $5,000,000.

33. Plaintiffs, on behalf of themselves and the putative Class, seek actual damages, compensatory damages, statutory damages, statutory penalties, punitive damages, equitable relief, and attorneys' fees, among other categories of damages. Compl. p. 38, Prayer for Relief.

34. The CIPA §§ 631 and 632 violations claimed here provide for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Class. Compl. ¶¶ 129, 135.

35. If just 1% of the 423,104 California based users who visited fullscript.com declined optional cookies and tracking technologies, and were thus, under Plaintiffs theory, affected by a purported CIPA violation, the amount in controversy for that violation alone is **$21,155,000**.

36. The aforementioned figure does not account for the additional CIPA violations alleged, the breach of contract or unfair competition claims, punitive damages, equitable relief, or attorneys' fees.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

37. Additionally, the value of injunctive relief may be aggregated with other damages to satisfy the amount in controversy for CAFA. *Rodgers v. Cent. Locating Serv.*, Ltd., 412 F. Supp. 2d 1171, 1179 (W.D. Wash. 2006). "[T]he 'value' of injunctive relief is determined by calculating the defendant's cost of compliance[.]" *Tehrani v. Macys W. Stores, Inc.*, No. LACV1507286JAKEX, 2016 WL 1559085, at *3 (C.D. Cal. Apr. 18, 2016) (citing *Id.*). No allegations in the Complaint allow Fullscript to calculate the amount of injunctive relief. However, Fullscript underscores the allegations to the Court as further evidence that the amount in controversy exceeds $5,000,000.

38. Although Fullscript denies that Plaintiffs are entitled to *any* relief, Plaintiffs' requests for actual damages, compensatory damages, statutory damages, statutory penalties, punitive damages, equitable relief, and attorneys' fees places the amount in controversy well above the $5,000,000 threshold, based on the allegations in the complaint and Defendant's preliminary review of its records.

39. Accordingly, because this action is pled as a class action and minimal diversity, class size, and the amount in controversy requirements of CAFA are satisfied, Fullscript has properly removed the State Court Action to this Court.

## IV. NOTICE

40. Pursuant to 28 U.S.C. § 1446(d), Defendant will give written notice of the filing of this Notice of Removal to all parties of record in this action and will file

a copy of this Notice of Removal with the Clerk for the Superior Court of California for the County of Los Angeles.

## V. CONCLUSION

41. **WHEREFORE**, Fullscript notifies the Court that this action has been removed from the Superior Court of California for the County of Los Angeles to the United States District Court for the Central District of California, pursuant to the provisions of CAFA (28 U.S.C. §§ 1332(d) and 1453) and pursuant to 28 U.S.C. §§ 1441 and 1446.

Dated: June 5, 2026

Respectfully submitted,

**BAKER & HOSTETLER LLP**

By: *<u>/s/ Alexander Vitruk</u>*
ALEXANDER VITRUK
SPENCER PERSSON
*Attorneys for Defendants*
HEALTHY, WEB INC. and NATURAL PARTNERS INC., d/b/a FULLSCRIPT

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

# EXHIBIT 1

CLEAR FORM

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself [ ] )

Kristin Baker and Stacy Penning, individually and on behalf of putative class

**DEFENDANTS** ( Check box if you are representing yourself [ ] )

Healthy Web, Inc. and Natural Partners, Inc. d/b/a Fullscript

(b) County of Residence of First Listed Plaintiff: Los Angeles
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant: Maricopa
*(IN U.S. PLAINTIFF CASES ONLY)*

(c) Attorneys (*Firm Name, Address and Telephone Number*) If you are representing yourself, provide the same information.
(Eddie) Jae K. Kim
Tiffine E. Malamphy
Phone: (619) 762-1910, 9171 Towne Centre Dr, Ste 180, San Diego, CA 92122

Attorneys (*Firm Name, Address and Telephone Number*) If you are representing yourself, provide the same information.
Alexander Vitruk
Telephone (310) 820-8800
1900 Avenue of the Stars, Suite 2700
Los Angeles, CA 90067

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

- [ ] 1. U.S. Government Plaintiff
- [ ] 3. Federal Question (U.S. Government Not a Party)
- [ ] 2. U.S. Government Defendant
- [X] 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [X] 1 | [ ] 1 | Incorporated or Principal Place of Business in this State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business in Another State | [ ] 5 | [X] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

**IV. ORIGIN** (Place an X in one box only.)

- [ ] 1. Original Proceeding
- [X] 2. Removed from State Court
- [ ] 3. Remanded from Appellate Court
- [ ] 4. Reinstated or Reopened
- [ ] 5. Transferred from Another District (Specify)
- [ ] 6. Multidistrict Litigation - Transfer
- [ ] 8. Multidistrict Litigation - Direct File

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** [X] Yes [ ] No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** [X] Yes [ ] No [X] **MONEY DEMANDED IN COMPLAINT:** $ Not specified

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. § 1332(d), 1441, 1446, 1453

**Does this case involve claimed Lemon Law violations of the federal Magnuson-Moss Warranty Act and/or the California Song-Beverly Consumer Warranty Act?** YES NO ✕

**VII. NATURE OF SUIT** (Place an X in one box only).

**OTHER STATUTES**
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce/ICC Rates/Etc.
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced & Corrupt Org.
- [ ] 480 Consumer Credit
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Info. Act
- [ ] 896 Arbitration
- [ ] 899 Admin. Procedures Act/Review of Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loan (Excl. Vet.)
- [ ] 153 Recovery of Overpayment of Vet. Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment

**REAL PROPERTY CONT.**
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**TORTS PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Fed. Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [X] 360 Other Personal Injury
- [ ] 362 Personal Injury-Med Malpratice
- [ ] 365 Personal Injury-Product Liability
- [ ] 367 Health Care/Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

**TORTS PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**CIVIL RIGHTS**
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/Accommodations
- [ ] 445 American with Disabilities-Employment
- [ ] 446 American with Disabilities-Other
- [ ] 448 Education

**PRISONER PETITIONS**

**Habeas Corpus:**
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

**Other:**
- [ ] 540 Mandamus/Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee Conditions of Confinement

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Mgmt. Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Ret. Inc. Security Act

**PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016 (DTSA)

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405 (g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405 (g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS-Third Party 26 USC 7609

**FOR OFFICE USE ONLY:** Case Number:

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| **QUESTION A: Was this case removed from state court?** ☒ Yes ☐ No | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| If "no, " skip to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question E, below, and continue from there. | ☒ Los Angeles, Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| | | |
|---|---|---|
| **QUESTION B: Is the United States, or one of its agencies or employees, a PLAINTIFF in this action?** ☐ Yes ☒ No | **B.1.** Do 50% or more of the defendants who reside in the district reside in Orange Co.? *check one of the boxes to the right* → | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
| | | ☐ NO. Continue to Question B.2. |
| If "no, " skip to Question C. If "yes," answer Question B.1, at right. | **B.2.** Do 50% or more of the defendants who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.) *check one of the boxes to the right* → | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| | | ☐ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| | | |
|---|---|---|
| **QUESTION C: Is the United States, or one of its agencies or employees, a DEFENDANT in this action?** ☐ Yes ☒ No | **C.1.** Do 50% or more of the plaintiffs who reside in the district reside in Orange Co.? *check one of the boxes to the right* → | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
| | | ☐ NO. Continue to Question C.2. |
| If "no, " skip to Question D. If "yes," answer Question C.1, at right. | **C.2.** Do 50% or more of the plaintiffs who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.) *check one of the boxes to the right* → | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| | | ☐ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| **QUESTION D: Location of plaintiffs and defendants?** | **A.** Orange County | **B.** Riverside or San Bernardino County | **C.** Los Angeles, Ventura, Santa Barbara, or San Luis Obispo County |
|---|---|---|---|
| Indicate the location(s) in which 50% or more of *plaintiffs who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☒ |
| Indicate the location(s) in which 50% or more of *defendants who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☐ |

| **D.1. Is there at least one answer in Column A?** | **D.2. Is there at least one answer in Column B?** |
|---|---|
| ☐ Yes ☒ No | ☐ Yes ☒ No |
| If "yes," your case will initially be assigned to the SOUTHERN DIVISION. Enter "Southern" in response to Question E, below, and continue from there. If "no," go to question D2 to the right. → | If "yes," your case will initially be assigned to the EASTERN DIVISION. Enter "Eastern" in response to Question E, below. If "no," your case will be assigned to the WESTERN DIVISION. Enter "Western" in response to Question E, below. ↓ |

| **QUESTION E: Initial Division?** | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, C, or D above: → | Western |

**QUESTION F: Northern Counties?**

Do 50% or more of plaintiffs or defendants in this district reside in Ventura, Santa Barbara, or San Luis Obispo counties? ☐ Yes ☒ No

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**IX(a). IDENTICAL CASES**: Has this action been previously filed **in this court**? ☒ NO ☐ YES

If yes, list case number(s): ____________

**IX(b). RELATED CASES**: Is this case related (as defined below) to any civil or criminal case(s) previously filed **in this court**? ☒ NO ☐ YES

If yes, list case number(s): ____________

**If yes, you must file a Notice of Related Cases. See Local Rule 83-1.3.**

**Civil cases** are related when they (check all that apply):

☐ A. Arise from the same or a closely related transaction, happening, or event;

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges.

Note: That cases may involve the same patent, trademark, or copyright is not, in itself, sufficient to deem cases related.

**A civil forfeiture case and a criminal case** are related when they (check all that apply):

☐ A. Arise from the same or a closely related transaction, happening, or event;

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. Involve one or more defendants from the criminal case in common and would entail substantial duplication of labor if heard by different judges.

**X. STATEWIDE OR NATIONWIDE RELIEF**: Does this case seek to bar or mandate enforcement of a state or federal law and seek declaratory or injunctive relief on a statewide or nationwide basis? ☒ NO ☐ YES

**If yes, see Local Rule 83-11 for additional requirements.**

**XI. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):** /s/ Alexander Vitruk DATE: 6/5/20

**Notice to Counsel/Parties:** The submission of this Civil Cover Sheet is required by Local Rule 3-1. This Form CV-71 and the information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. For more detailed instructions, see separate instruction sheet (CV-071A).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

# EXHIBIT 2

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**Electronically FILED by**
**Superior Court of California,**
**County of Los Angeles**
**4/30/2026 1:51 PM**
**David W. Slayton,**
**Executive Officer/Clerk of Court,**
**By A. Radillo, Deputy Clerk**

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***
HEALTHY WEB INC. and NATURAL PARTNERS, INC., d/b/a FULLSCRIPT,

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***
KRISTIN BAKER and STACY PENNING, individually and on behalf of all others similarly situated,

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

***¡AVISO!** Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Los Angeles Superior Court
Stanley Mosk Courthouse, 111 North Hill Street, Los Angeles, CA 90012

CASE NUMBER:
*(Número del Caso):*
26STCV13931

David W. Slayton, Executive Officer/Clerk of Court

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
(Eddie) Jae K. Kim, LYNCH CARPENTER, LLP, 9171 Towne Centre Drive, Suite 180, San Diego, CA 92122, Tel.: (619) 762-1910

DATE: 04/30/2026
*(Fecha)*

Clerk, by *(Secretario)* A. Radillo , Deputy *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*

under:
- ☐ CCP 416.10 (corporation)
- ☐ CCP 416.20 (defunct corporation)
- ☐ CCP 416.40 (association or partnership)
- ☐ other *(specify):*
- ☐ CCP 416.60 (minor)
- ☐ CCP 416.70 (conservatee)
- ☐ CCP 416.90 (authorized person)

4. ☐ by personal delivery on *(date)*:

# EXHIBIT 3

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Spring Street Courthouse<br>312 North Spring Street, Los Angeles, CA 90012 | FILED<br>Superior Court of California<br>County of Los Angeles<br>04/30/2026<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: A. Radillo Deputy |
| **NOTICE OF CASE ASSIGNMENT**<br>**UNLIMITED CIVIL CASE** | |
| **Your case is assigned for all purposes to the judicial officer indicated below.** | CASE NUMBER:<br>26STCV13931 |

**THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT**

| | ASSIGNED JUDGE | DEPT | ROOM | | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|---|
| ✔ | Theresa M. Traber | 1 | | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record on 05/01/2026 (Date)

David W. Slayton, Executive Officer / Clerk of Court

By A. Radillo, Deputy Clerk

# INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

**APPLICATION**
The Division 7 Rules were effective January 1, 2007. They apply to all general civil cases.

**PRIORITY OVER OTHER RULES**
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

**CHALLENGE TO ASSIGNED JUDGE**
A challenge under Code of Civil Procedure Section 170.6 must be made within **15** days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

**TIME STANDARDS**
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

**COMPLAINTS**
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

**CROSS-COMPLAINTS**
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

**STATUS CONFERENCE**
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

**FINAL STATUS CONFERENCE**
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date. All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference. These matters may be heard and resolved at this conference. At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

**SANCTIONS**
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules. Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is imperative.**

**Class Actions**
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

***Provisionally Complex Cases**
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status. If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

# EXHIBIT 4

**LYNCH CARPENTER, LLP**
(Eddie) Jae K. Kim (SBN 236805)
ekim@lcllp.com
Tiffine E. Malamphy (SBN 312239)
tiffine@lcllp.com
9171 Towne Centre Dr, Ste 180
San Diego, CA 92122
Telephone: (619) 762-1910
Facsimile: (858) 313-1850

*Attorneys for Plaintiffs and Proposed Class Counsel*

**Electronically FILED by Superior Court of California, County of Los Angeles 4/30/2026 1:51 PM David W. Slayton, Executive Officer/Clerk of Court, By A. Radillo, Deputy Clerk**

**IN THE SUPERIOR COURT OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

| | |
|---|---|
| KRISTIN BAKER and STACY PENNING, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>HEALTHY WEB INC. and NATURAL PARTNERS, INC., d/b/a FULLSCRIPT,<br><br>Defendants. | Case No.: 26STCV13931<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Kristin Baker and Stacy Penning, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendants Healthy Web Inc. and Natural Partners, Inc., d/b/a Fullscript (together, "Defendant" or "Fullscript"). Plaintiffs allege the following upon personal knowledge as to their own actions and upon information as to all other matters:

## INTRODUCTION

1. This case arises from Fullscript's violation of patients' privacy and breach of their trust.

2. Despite explicitly promising patients that their data will not be shared with third parties for "Targeting," "Performance," or "Functional" purposes, Fullscript installs tracking technology ("Trackers" or "Third-Party Trackers") from multiple third parties (including Iterable, Appcues, Rudderstack, and—via Iterable's installation of additional cookies—Google, Facebook, Adobe, ZoomInfo, and Bing (the "Third Parties")) on its patient-facing website and allows these Third Parties to intercept and harvest patients' information for targeting, performance, and functional purposes. Furthermore, Fullscript knowingly allows and enables one of these Third Parties—Iterable—to install cookies from Bing, Google, Facebook, ZoomInfo, and Adobe, through which Iterable likely shares intercepted information with Bing, Google, Facebook, ZoomInfo, and Adobe. Intercepted information includes the user's patient status; the specific medical condition for which the patient is seeking supplements; the patient's email address; and additional identifiers that enable the Third Parties to uniquely identify the patient and track that patient's subsequent activities on the Internet.

3. Fullscript owns and operates the website www.fullscript.com. Fullscript.com is a platform on which patients may purchase health supplements. Popular products sold on the site include a capsule called "Libido Stim-M" for "supporting sexual desire and fertility (sperm concentration/motility),"[1] a "Basic Prenatal" multivitamin for expectant mothers, and "Magnesium (Glycinate)," which Fullscript claims "helps activate enzymes for physiological functions including cardiac health."[2] The website has two types of users: healthcare providers and patients. "Providers create a free account and invite their patients. . . Patients receive a secure link to . . . order supplements—delivered right to their door."[3] Patients are

---

[1] *See* https://us.fullscript.com/u/catalog/product/U3ByZWU6OlByb2R1Y3QtNzI0NTk =?variant=U3ByZWU6OlZhcmlhbnQtNzI0NTk= (last accessed April 2026).

[2] *See* https://fullscript.com/catalog (last accessed April 2026).

[3] Quoted text available at: https://fullscript.com/ (last accessed April 2026).

encouraged to use the site to purchase health supplements for specific conditions (*e.g.*, low libido, pregnancy, poor cardiac health, *etc.*).

4. When patients first visit the site, Fullscript displays a "cookie consent banner" designed to reassure patients that they have control over when and how their medical information will be collected, used, and shared as they browse Defendant's website.[4] The banner states that "we use cookies and other tracking technologies," further explaining that "[w]e process your personal information to measure and improve our sites and service, including to enhance your experiences, to assist our marketing campaigns, and to provide personalized content and advertising." The banner invites patients to "visit the preference center to learn more and choose your preferences," which patients may do be clicking the white-with-blue-trim button labelled "Preference Center." Alternatively, patients may click the blue button labelled "Reject All" to reject all non-essential "cookies and other tracking technologies." Or they may click "Accept All Cookies" to accept all "cookies and other tracking technologies."

5. Clicking "Preference Center" reveals a pop-up entitled "Privacy Preference Center." The pop-up admits that "technologies we use may be considered selling or sharing/targeted advertising that provides you **the right to opt out** of such practices under applicable **state laws**." (Emphasis added.) In line with the requirements of state law (including California's), Defendant represents that "you can choose not to allow certain types of cookies and other tracking technologies." The pop-up categorizes the tracking technologies present on Defendant's website into four categories. Only one category is marked "Strictly Necessary." Defendant represents that clicking "Reject All" will remove tracking technologies in the other three categories, which are: (1) "Functional," (2) "Performance," and (3) "Targeting."

6. The cookie consent banner also contains a link to Defendant's "Privacy Statement."[5] The Privacy Statement represents that Defendant collects "Sensitive personal information" including "information concerning your health" and "information concerning your sex life (such as your purchases of sexual health products using our Services)." The Privacy Statement confirms that said information is collected through "website interactions (site visits, search queries, IP address, and device details)." The Privacy Statement further states that "[w]e may also make certain categories of personal information

[4] The banner appears immediately upon a patient's first visit to Defendant's website. It is displayed prominently and persists until the user clicks "Accept All Cookies," "Reject All," or "Preference Center."

[5] Available at: https://fullscript.com/legal/privacy (last accessed April 2026).

available [to Third Parties] in order to receive certain benefits or services." When such sharing occurs, "[t]he business or commercial purpose for sharing is to deliver personalized advertising based on your interests. For example, when [*sic*] we make browsing information available to third party advertising companies . . . in order to improve and measure our advertising campaigns and reach users with more relevant advertisements and content across different websites or online platforms that you may visit." The Privacy Statement represents that patients may opt out of this sharing. "[Y]ou may opt out of the sharing of your personal information for targeted advertising by declining advertising cookies through the banner or Preference Center."

7. Unfortunately for the patients who place their trust in Fullscript, Defendant fails to honor its promises. In violation of the contractual promises made in its cookie banner and associated "Cookie Preferences" popup, Defendant shares patient information—including patients' email addresses, a unique ID associated with the patient, and the medical conditions for which the patient is seeking treatment—with multiple Third Parties, including Third Parties that enable personalized advertising. As one example, tracking technologies from Iterable remain present on the website regardless of whether the patient opts out. Without the patient's knowledge and despite their explicit opt-out via the cookie banner, Iterable intercepts and receives the patient's email address, a unique ID tied to the patient, and the type of condition for which they are seeking treatment (*e.g.*, "Men's sexual support"). Further, Iterable surreptitiously installs additional cookies from Facebook, Google, Bing, ZoomInfo, and Adobe, indicating that Iterable likely shares the collected information with these Third Parties as well.

8. After patients attempt to opt out of optional tracking technologies via Defendant's cookie banner, Defendant surreptitiously and illegally installs website Trackers from various Third Parties. These include Iterable, Appcues, Rudderstack, and—via Iterable's installation of additional cookies—Google, Facebook, Adobe, ZoomInfo, and Bing. The Third Parties track patients' browsing activities, eavesdrop on patients' private communications with Defendant, and intercept sensitive medical and identifying information Defendant instructs patients to provide as they browse for medical information about their conditions and explore Fullscript supplements designed to treat those conditions.

9. The Third-Party Trackers installed by Defendant enable the Third Parties to lurk silently in the background, observing every action the patient performs on the site even after the Defendant expressly

promised it would *not* allow this tracking and interception of patients' browsing activity. By means of the Trackers, the Third Parties intercept, store, use, and sell private information gleaned from patients' interactions with the site, including: their patient status, which is itself protected health information; their email address; the specific condition or conditions from which they suffer; the name and identity of the medical provider who invited them to join the site; and unique identifiers such as an IP address or other ID uniquely associated with each patient.

10. By knowingly deploying these tracking technologies in violation of its own express assurances and without meaningful patient consent, Defendant violated the California Invasion of Privacy Act, Cal. Pen. Code § 630 *et seq*. ("CIPA"), and fundamental expectations of privacy inherent in California law and the California Constitution. The expectation of privacy is particularly important here, where the patients' interactions with Defendant's website usually involve *researching specific medical conditions and/or supplements intended to treat those conditions*. Plaintiffs bring this action to hold Defendant accountable for its unlawful wiretapping and its deceptive practices that left patients exposed—without warning, without choice, and without recourse.

11. This type of tracking and data sharing is exactly what the patients who declined consent via the cookie banner sought to avoid. Defendant falsely told patients it respected their privacy, and that they could avoid tracking and data sharing when they used the Defendant's website. Multiple aspects of Defendants' website, including its cookie banner, are designed to reassure patients their use of Defendant's website will remain a private interaction between the patient and Defendant. Nevertheless, despite receiving notice of patients' express declination of consent, Defendant defied their expressed desires. Defendant thereby violated state statutes, tort duties, and breached its contractual duties and the implied covenant of good faith and fair dealing.

12. Defendant sold out patients' trust for a simple reason: money. Defendant allowed Third Parties to track patients' browsing activity in part because doing so earns Defendant money from marketing and advertising. As Defendant's Privacy Statement acknowledges, Defendant allowed the Third Parties to track its patients' browsing activity in part because doing so enables Defendant to more effectively advertise its products on its own and other websites, thus earning sales revenue. Defendant's online advertising efforts become more effective when it allows Third Party data brokers to intercept patients'

online communications and bundle this with additional information collected while the patient browses other sites. For example, if a patient navigates to fullscript.com to explore or purchase treatments related to fertility, they might later see ads for Defendant's fertility supplements on other websites, or they might see a version of the fullscript.com website that is customized to their medical condition and interest in fertility supplements the next time they visit. These "retargeting" tactics are made possible because Defendant allowed the Third-Party data broker to silently observe and record what the patient did while on Defendant's website, without the patient's knowledge and in defiance of the patient's express rejection of cookies and tracking technologies.

## THE PARTIES

13. Plaintiff Kristin Baker is a natural person and a citizen of California, where she intends to remain. Plaintiff Baker resides in Long Beach, California. Plaintiff Baker used Defendant's website to browse for and order health supplements. Plaintiff Baker is a victim of Defendant's unauthorized disclosure of her private identifying and medical information to Third Parties, despite Plaintiff Baker's express instruction not to disclose her information and Defendant's contractual promise not to do so.

14. Plaintiff Stacy Penning is a natural person and a citizen of California, where he intends to remain. Plaintiff Penning resides in El Cerrito, California. Plaintiff Penning visited Defendant's website and viewed various health supplement products. Plaintiff Penning is a victim of Defendant's unauthorized disclosure of his private identifying and medical information to Third Parties, despite Plaintiff Penning's express instruction not to disclose his information and Defendant's contractual promise not to do so.

15. Defendant Health Web, Inc., d/b/a Fullscript Inc., is a Delaware corporation with its principal place of business in Scottsdale, Arizona. Defendant Healthy Web, Inc., owns and operates the website Fullscript.com jointly with Natural Partners, Inc, and the "Terms of Service" for fullscript.com state that the website is "provided by Natural Partners, Inc., Healthy Web Inc., and/or their subsidiaries or affiliated companies."[6] Defendant Healthy Web, Inc., transacts and has transacted business in this State, and operates a distribution center in Riverside, California.

16. Defendant Natural Partners, Inc., d/b/a Fullscript Inc., is a Delaware corporation with its principal place of business in Scottsdale, Arizona. Defendant Natural Partners, Inc., owns and operates the

[6] Available at https://fullscript.com/legal/terms-of-service (last accessed April 2026).

website Fullscript.com jointly with Healthy Web, Inc, and the "Terms of Service" for fullscript.com state that the website is "provided by Natural Partners, Inc., Healthy Web Inc., and/or their subsidiaries or affiliated companies."[7] Defendant Natural Partners, Inc., transacts and has transacted business in this State, and operates a distribution center in Riverside, California.

**JURISDICTION AND VENUE**

17. This Court has personal jurisdiction over Defendant. Personally or through its agents, Defendant operates, conducts, engages in, or carries on a business in this State, and committed tortious acts in this State. Defendant's website acknowledges that it does business in California and includes content expressly directed at California consumers and prospective employees, including California-specific portions of its "Privacy Statement" and "Terms of Service."

18. The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California. Defendant owns and operates a distribution center in Riverside, California.[8]

19. Plaintiffs both reside in California, visited Defendant's website in California, and were residents of California when Defendant illegally shared their sensitive medical and identifying information with Third Parties.

**COMMON FACTUAL ALLEGATIONS**

**I. Defendant's Website Collects Sensitive Medical and Personal Identifying Information from Patients.**

20. Defendant owns and operates the website www.fullscript.com. Fullscript.com is a platform on which patients may purchase health supplements. Popular products sold on the site include a capsule called "Libido Stim-M" for "supporting sexual desire and fertility (sperm concentration/motility),"[9] a

---

[7] Available at https://fullscript.com/legal/terms-of-service (last accessed April 2026).

[8] *See* https://fullscript.com/careers (last accessed April 2026) (referring to "Our distribution center() in . . . Riverside (California).").

[9] *See* https://us.fullscript.com/u/catalog/product/U3ByZWU6OlByb2R1Y3QtNzI0NTk=?variant=U3ByZWU6OlZhcmlhbnQtNzI0NTk= (last accessed April 2026).

"Basic Prenatal" multivitamin for expectant mothers, and "Magnesium (Glycinate)," which Fullscript claims "helps activate enzymes for physiological functions including cardiac health."[10] The website has two types of users: healthcare providers and patients. "Providers create a free account and invite their patients. . . Patients receive a secure link to . . . order supplements—delivered right to their door."[11] Patients are encouraged to use the site to purchase health supplements recommended by their healthcare providers for specific conditions (*e.g.*, low libido, pregnancy, poor cardiac health, *etc.*).

21. The information Defendant's website collects from patients as they visit these pages is highly sensitive and private. When patients create an account, they are prompted to provide their personal email address, which serves as a username. Defendant also assigns the patient one or more additional unique identifiers, tied to the patient's browser and/or IP address, which allows the patient to be identified after they leave Fullscript's site and browse to other locations on the Internet. The patient's account is linked to that of the medical provider who invited the patient to join Fullscript. Defendant collects and stores both the name of the patient's medical provider and the fact of a provider-patient relationship. Upon signing in, patients are prompted to choose from a list of "Health conditions," including "Menstruation," "Blood pressure support," "Men's sexual support," "Children's immune support," "Cognition," "Bowel support," and more. Patients who click these links are shown a list of Fullscript supplements designed to treat the condition, which patient may purchase by clicking "Add to cart." As patients navigate to these pages, Fullscript collects the name of the medical condition for which the patient is seeking treatment.

22. Knowing the information it collects is sensitive, Defendant designed its website to reassure patients that neither their patient status and condition, nor their browsing activities as they research conditions and supplements, will be shared with Third Parties without consent. The very first piece of content Defendant's website displays to first-time visitors is a "cookie consent banner." The banner admits that by default, "we use cookies and other tracking technologies" for multiple purposes, including to "to assist our marketing campaigns, and to provide personalized content and advertising." However, to make patients feel they have control over the information they generate while browsing the site, Defendant reassures patients that they may opt out of non-necessary cookies and other tracking technologies, either

[10] *See* https://fullscript.com/catalog (last accessed April 2026).
[11] Quoted text available at: https://fullscript.com/ (last accessed April 2026).

by clicking "Reject All" on the cookie consent banner, or by clicking "Preference Center" and using the resulting pop-up to opt out of specific categories.

23. Thus, Defendant's website encourages patients to share sensitive and private information with Defendant, including their private email addresses, potentially embarrassing medical conditions, interest in Fullscript supplements designed to treat those conditions, and the identity of their medical provider. To bolster patient trust and induce patients to share sensitive information, Defendant's cookie banner and associated "Preference Center" pop-up makes a contractual promise that Defendant will *not* allow Third-Party interception of patient browsing activity for non-essential purposes if patients click "Reject All."

24. Unbeknownst to patients, and in direct contravention of the reassurances and contractual promises in its cookie banner and "Preferences Center" pop-up, Defendant immediately discloses patients' sensitive and private information to Third Parties, including Iterable, Appcues, Rudderstack and—via additional cookies associated with Iterable—Google, Bing, Adobe, ZoomInfo, and Facebook. The disclosure occurs because Defendant's website includes Trackers and cookies that intercept patients' communications with Defendant and share the contents of those communications with multiple Third Parties. What's worse, Defendant enables Third Parties to intercept this sensitive and private information even if visitors explicitly direct Defendant not to do so via Defendant's illusory opt-out cookie banner.

25. Before describing Defendant's cookie banner and the specific Third-Party Trackers and cookies that persist on its website even after visitors attempt to opt out, it is useful to discuss how Trackers and cookies work in general.

## II. How Cookies and Trackers Surreptitiously Share Patients' Communications and Unique Identifiers with Third Parties.

26. Visiting a website involves a series of electronic communications between the visitor's browser and the website's servers. When a person visits a website like fullscript.com, their browser initiates a series of web requests to Defendant's servers, requesting the webpage and associated resources. These are typically styled as HTTP "GET" requests. As the visitor's browser processes the webpage, additional requests may be triggered by scripts embedded within the webpage. These scripts are instructions sent by the webpage to the visitor's browser, which the visitor's browser then executes.

27. A visitor's interactions with a website may also involve HTTP "POST" requests. In a typical POST request, the visitor's browser sends information to the website's server.

28. "Trackers" (or "tracking technologies") are one type of script that may be embedded within a webpage delivered in response to a "GET" request. Trackers instruct a visitor's browser to send information about the visitor's browsing activity to the Tracker's developer. Tracked browsing information may include words typed, links clicked, time spent on each page, and buttons clicked by the visitor. This browsing information is typically accompanied by one or more data points that uniquely identify the visitor, such as their IP address or a "cookie."

29. "Cookies" are small text files sent by a website server to a visitor's browser and stored locally on the visitor's device. Typically, cookies contain a unique identifier tied to a specific visitor. When a visitor's browser sends an HTTP request to a website server, the request includes the cookie or cookies that allow the server to identify the visitor.

30. First-party Trackers and cookies are those developed and set by the web server with which the visitor is knowingly communicating. Here, first-party Trackers and cookies would be developed by Defendant and set by Defendant's website, fullscript.com.

31. Third-Party Trackers and cookies are those developed and set by a Third-Party company or domain. Common Third-Party Trackers and cookies include those developed and set by Iterable, Appcues, Rudderstack, Facebook, Google, Adobe, ZoomInfo, and Bing, all of which are embedded in Defendant's website regardless of patient opt-outs. When a patient's browser loads a webpage containing an embedded Third-Party Tracker, the Tracker—which is simply a script, *i.e.*, lines of code—instructs the patient's browser to determine whether that Third-Party's cookie is already stored on the visitor's device. If not, the Tracker instructs the browser to store a new cookie uniquely associated with that visitor. If so, the Tracker instructs the browser to send the stored cookie to the Third-Party's server, typically along with additional information about the patient's browsing activity.

32. Because Third-Party cookies persist across multiple sessions and webpages, Third-Party cookies allow their developers to track specific individual's browsing across websites and sessions.

33. Third-Party Trackers and cookies like those present on Defendant's website are generally invisible to the visitor, unless the visitor uses custom software designed to reveal Trackers and cookies.

34. When a visitor accesses a webpage containing Third-Party Trackers and cookies, the Trackers instantaneously intercept and duplicate communications sent between the visitor's browser and the website's server. Duplicated communications include the HTTP "GET" requests through which the visitor's browser requests the webpage and related resources, as well as the HTTP "POST" requests.

35. Thus, while it appears to the visitor that their browser is communicating only with the owner of a specific website, in fact their communications are intercepted and shared in real-time with undisclosed Third Parties.

36. Here, while visitors to Fullscript.com believe they are communicating only with Defendant, in fact their intercepted and shared in real-time with various Third Parties—including Iterable, Appcues, Rudderstack, Facebook, Google, Adobe, ZoomInfo, and Bing—via the Third Party Trackers Defendant allowed to be embedded in its website.

37. Third-Party Trackers and cookies represent an invasion of privacy. Indeed, 62% of respondents in a recent survey of North American consumers stated that they were uncomfortable with online tracking, with 19% of respondents feeling "completely violated" by online tracking.[12]

38. When Third-Party Trackers and cookies are present on consumer-facing websites, information that consumers expect to remain private between themselves and the website's owner is surreptitiously intercepted and shared with undisclosed Third Parties.

**III. Defendant Falsely Promises that Patients May Opt-Out of Third-Party Cookies and Tracking.**

39. Many websites allow visitors to affirmatively opt-out of Third-Party Trackers and cookies. These opt-out tools are especially relevant where, as here, the website collects information that is particularly sensitive and private, such as a medical condition a patient wishes to keep private.

40. The ability to opt-out of Third-Party tracking gives patients comfort knowing that they may safely share private and sensitive medical information with a specific company (*e.g.*, a provider of medical products) without fear that the information will be shared more widely. Were it not for the ability to opt-

[12] *Nearly 80% of Consumers Favor Brand Transparency of Personal Data Use in Digital Advertising*, GumGum (Mar. 19, 2025), https://gumgum.com/press-releases/na-digital-advertising-pulse-check-3.

out of Third-Party tracking, many patients would not be comfortable sharing their medical information on the Internet.

41. Defendant purports to offer a tool by which patients may opt-out of Third-Party Trackers and cookies, in the form of a "cookie consent banner." The cookie consent banner is designed to give patients comfort that the information they generate by browsing and using Defendant's websites will not be shared with Third Parties.

42. Unfortunately for Plaintiffs and members of the putative Class, Defendant's purported opt-out mechanism is illusory. Defendant embeds Third-Party Trackers and cookies, including many Third-Party Trackers and cookies that Defendant misleadingly describes as optional, *even when the patient clicks "Reject All" on the cookie consent banner*. Thus, Defendant shares visitors' sensitive and private medical and identifying information with multiply Third Parties, even after explicitly promising *it will not*.

43. As discussed above, Defendant owns and operates Fullscript.com. Defendant's website presents a cookie banner to visitors upon their first visit. The banner, shown below, persists on every page unless and until the patient interacts with it. Thus, every visitor to Defendant's website sees the same cookie banner, and must choose one of the three available options before proceeding to use the site.




44. The cookie consent banner represents that the patient may opt of optional "cookies and other tracking technologies" by clicking "Reject All." The banner also states that a patient may click "Accept All Cookies" to opt-in to the interception of their medical and identifying information by Third Parties. The banner further represents that the patient may click "Preference Center" to "learn more and choose your preferences." The cookie consent banner also contains a dark blue hyperlink linking to Defendant's "Privacy Statement."

45. Clicking "Preference Center" reveals a pop-up entitled "Privacy Preference Center." The pop-up admits that "technologies we use may be considered selling or sharing/targeted advertising that provides you **the right to opt out** of such practices under applicable **state laws**." (Emphasis added.) In line with the requirements of state law (including California's), Defendant represents that "you can choose not to allow certain types of cookies and other tracking technologies."




46. The lower part of this same page of the pop-up proceeds to categorize the tracking technologies present on Defendant's website into four categories. Only one category is marked "Strictly Necessary." In the "Privacy Preference Center" paragraph preceding these categories, however, Defendant represents that clicking "Reject All" will remove tracking technologies in the other three categories, which are: (1) "Functional," (2) "Performance," and (3) "Targeting."




47. Clicking the "plus" sign adjacent to any of these categories reveals text describing the category. For example, clicking the plus adjacent to "Targeting" reveals text stating that these technologies "may be set through our site by our advertising partners and similar website tracking partners. They may be used by those companies to build a profile of your interests and show you relevant adverts on other sites. . . [T]he use of these technologies is based on **uniquely identifying your browser and internet device**." (Emphasis added.)




48. The cookie consent banner also contains a link to Defendant's "Privacy Statement."[13] The Privacy Statement represents that Defendant collects "Sensitive personal information" including "information concerning your health" and "information concerning your sex life (such as your purchases

[13] Available at: https://fullscript.com/legal/privacy (last accessed April 2026).

of sexual health products using our Services." The Privacy Statement confirms that said information is collected through "website interactions (site visits, search queries, IP address, and device details)." The Privacy Statement further states that "[w]e may also make certain categories of personal information available [to Third Parties] in order to receive certain benefits or services." When such sharing occurs, "[t]he business or commercial purpose for sharing is to deliver personalized advertising based on your interests. For example, when [*sic*] we make browsing information available to third party advertising companies . . . in order to improve and measure our advertising campaigns and reach users with more relevant advertisements and content across different websites or online platforms that you may visit." The Privacy Statement represents that patients may opt out of this sharing. "[Y]ou may opt out of the sharing of your personal information for targeted advertising by declining advertising cookies through the banner or Preference Center."

49. As alleged in more detail below, opting out of non-necessary tracking technologies via either the "Reject All" button or the linked "Preference Center" pop-up does **not** remove all non-necessary tracking technologies. As one example, cookies and Trackers from a company called Iterable remain present and active regardless of whether the patient opts out.

50. Iterable's core business function is behavioral marketing. Iterable collects, packages, sells, and uses information about individuals' interests to serve personalized advertisements. As Iterable's B2B marketing materials explain, websites like Fullscript.com incorporate Iterable's tracking technologies in order to "Drive More Engagement" by "Leverag[ing] real-time behavioral data to deliver personalized moments that capture attention and spark interaction."[14] Iterable claims that incorporating its tracking technologies "makes creating personalized, behavior-based customer journeys as easy as clicking send."[15] Thus, by its own description, Iterable's tracking technologies are used "to build a profile of your interests and show you relevant adverts on other sites." The quoted language is how Fullscript describes "Targeting" cookies in its "Privacy Preferences Center" pop-up. Thus, Iterable's tracking technologies are on Fullscript's website for "Targeting" purposes. They therefore should have been removed when patients clicked "Reject All" or opted out of "Targeting" technologies on the pop-up.

---

[14] Quoted text available at: https://iterable.com/ (last accessed April 2026).

[15] Quote text available at: https://iterable.com/whitepaper/a-cheat-sheet-for-behavioral-marketing-triggers/ (last accessed April 2026).

51. Furthermore, Iterable's marketing materials tout its integration with Facebook's advertising tools as an additional reason to incorporate Iterable's tracking technologies on a website. As Iterable explains in a burb entitled "Facebook Custom Audiences and Iterable":

> Brands leverage the Iterable and Facebook Custom Audience integration to send targeted custom audiences to Facebook for retargeting with advertising. For brands ready to grow their business, they can also create lookalike audiences to target and acquire new users with personalized ads.[16]

52. Thus, Iterable touts its ability to easily share intercepted customer data with Facebook as a *selling point*. The value proposition is straightforward: by allowing Iterable to intercept patient information and share it with Facebook, Fullscript gains the ability to more effectively target potential customers via Facebook ads. As alleged in more detail below, Iterable in fact installed cookies from multiple additional Third Parties on the Fullscript site, likely in order to share patient data with those additional Third Parties.

53. Defendant's cookie consent banner, associated "Privacy Preferences Center" pop-up, and Privacy Statement create the illusion that Defendant is a responsible steward of patients' identifying and medical information, and that patients have control over whether the information they generate while using Defendant's website will be intercepted by and shared with Third Parties. In fact, Defendant ignores patients' preferences, installing Third-Party Trackers and cookies regardless of whether patients opt-out. This includes multiple Third-Party Trackers that fall within categories Defendant explicitly identified as non-essential categories it promised to remove.

54. Even after patients opt-out of optional tracking technologies via Defendant's cookie banner, Defendant installs, at minimum, the following Third-Party Trackers and cookies on patients' browsers as they navigate Defendant's website. All cookies and Trackers listed here are implemented by Third Parties and are used for purposes Defendant characterized as "optional." They therefore should have been removed after the patient declined consent. Further, all of the below-listed cookies and Trackers uniquely identify individual patients:

a. Cookies associated with the domain iterable.com, including the "__cf_bm," "__q_state," "_cq_duid," "_ga," "_swb," "_hp2._id," "_spid.05ae," "_mkto_trk," "_uetsid,"

[16] https://partnerships.iterable.com/partners/technology/facebook-custom-audiences/ (last accessed April 2026).

"_vwo_uuid," and "_zitok" cookies, among many others, along with Trackers that cause patient information to be sent to the domains "api.iterable.com" and "us.fullscript.com."

i. Although appearing on Defendant's website as associated with the domain iterable.com, which is owned by Iterable, many of these cookies are implemented by and associated with other Third-Party marketing companies. For example:

1. "_ga" is implemented by Google.

2. "_mkto_trk" is implemented by Adobe and is associated with Adobe's "Marketo" service, which is used for targeted online advertising.

3. "_uetsid" is associated with Microsoft Bing and is used for targeted online advertising.

4. "_zitok" is associated with ZoomInfo, a B2B marketing platform that buys and sells consumer data for the purpose of targeted advertising and marketing.

ii. On information and belief, Iterable installs cookies from Google, Adobe, Bing, ZoomInfo, and Facebook because Iterable shares the patient information it intercepts and collects with those entities. Accordingly, every interception by Iterable is accompanied by a simultaneous and instantaneous interception by at least Google, Adobe, Bing, ZoomInfo, and Facebook.

iii. Data sharing between a party whose domain directly receives intercepted data (here, Iterable) and additional Third-Party marketers (here, at least Google, Adobe, Bing, ZoomInfo, and Facebook) is called "server-to-server" sharing. This form of data interception and data sharing is particularly insidious because it is not directly visible to the patient whose data is intercepted. Here, while the presence of cookies from additional Third-Party marketers is strong evidence of server-to-server sharing, Plaintiffs anticipate the discovery process will reveal additional confirmatory evidence.

iv. Network calls to the domain "us.fullscript.com" are labelled with the name "GraphQL_Iterable_Shared_Query." Although directed to a domain that appears to belong to Defendant (us.fullscript.com), these calls include cookie values for the cookie

"iterableEndUserId." The value of this cookie is the email address the patient used to sign up for a Fullscript account.

v. The naming convention for these network calls – which include the words "Iterable" and "Shared" – along with the presence of a value for the "itnerableEndUserId" value – indicates that Fullscript immediately and instantaneously sends the received information to Iterable.

b. Rudderstack's "rl_anonymous_id," "rl_trait," "rl_user_id," and "_swb" cookies, among many others, along with Trackers that cause patient data to be sent to the domain "rudderstack.com."

c. Trackers from Appcues.com that cause patient information to be sent to the domain "fast.appcues.com."

55. Thus, the representations Defendant makes in its cookie consent banner and "Preferences Center" pop-up are false. Even after patients opt out of optional cookies and tracking technologies via Defendant's cookie consent banner or pop-up, Defendant betrays their trust and installs "optional" Third-Party Trackers and cookies on their browsers anyway. This includes multiple cookies and tracking technologies used for targeted online marketing, one of the categories Defendant expressly promised to remove. The cookies and Trackers cause patient information to be transmitted to the Third Parties in real time as the patient browsers Defendant's website.

## IV. The Medical and Identifying Information Defendant Intercepted and Disclosed is Sensitive and Private.

56. The information Defendant's website transmits to Third Parties is private, sensitive, and confidential health information. Third Parties intercept patients' private email addresses, visits to informational pages specific to their medical conditions, the names and identities of the medical professionals who invited them to join the platform, and unique identifiers—including IP addresses, session IDs, device identifiers, and persistent tracking cookies—that enable Third Parties to link the disclosed health information to a specific, identifiable individual across browsing sessions. Plaintiffs refer herein to the customer information Defendant's website discloses as the "Disclosed Information."

57. The Third Parties' access to this information allows them to establish a particular individual's medical condition (*e.g.*, "Menopause," "Thyroid support," "Women's fertility support," "Heart & blood health," "Immune support," *etc.*), draw conclusions about their treatment-seeking behavior and interest in supplements, build targeted advertising profiles, learn the individual's private email address, and profit from the disclosed health information. Defendant's unauthorized disclosure of patients' private health information engenders a variety of harmful consequences, including: potentially higher insurance rates if the patient's conditions become known to insurers or employers; risk of employment discrimination; risk of data breach and further dissemination of sensitive health data; and the social stigma arising from the unintended disclosure of sensitive conditions, including colon cancer, diabetes, and having a brain tumor. As the text and design of Defendant's cookie banner suggests, patients are often very concerned with concealing these conditions. Patients share information about these conditions with Defendant in confidence and with the reasonable expectation that it will not be transmitted to Third Parties.

58. Information about a person's physical health is among the most confidential and sensitive information in our society, and the mishandling of medical information can have serious consequences, including discrimination in the workplace and denial of insurance coverage. If patients cannot trust that their medical information will be kept private, they may be less likely to seek necessary medical treatment, which can lead to more serious health problems and, ultimately, worse health outcomes. These concerns are especially acute here, where Defendant's website is designed specifically to attract and serve patients seeking treatment for serious, chronic, and stigmatized medical conditions that they have a strong interest in keeping confidential.

## V. Defendant Profits from its Non-Consensual Disclosure of Patients' Private Health Information, as do the Third Parties to Whom Defendant Discloses that Information.

59. On information and belief, Defendant and the Third Parties with whom Defendant shares visitors' private health information derive profit from the Disclosed Information through one or more of the following mechanisms: (1) building individualized profiles about patients' interests, medical purchases, medical conditions, and treatment history for the purpose of selling products, delivering targeted advertising, or displaying a customized version of Defendant's website to visitors on subsequent visits;

(2) selling the Disclosed Information directly to data brokers and advertisers; and (3) refining advertising targeting algorithms by training them on the Disclosed Information.

60. Data harvesting is big business. As one court recently held, "[the Defendant] cannot seriously dispute that browsing history and data mined from individuals using the internet has significant economic value. If it did not have value, then entire industries that sell and trade this data would not exist. As [the plaintiff's expert] explained, there is an entire 'data industry' and estimates suggests that that industry 'now generates combined annual revenues of approximately $300 billion dollars.'" *Doe v. Virginia Mason Med. Ctr.*, No. 19-2-26674-1 SEA, 2024 WL 3517759 (Wash. Sup. Ct., June 6, 2024).

61. In particular, the value of health data is well-known due to the media's extensive reporting on the subject. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry." Therein, Time Magazine described the extensive market for health data and observed that the health data market is both lucrative and a significant risk to privacy.[17]

62. On information and belief, Defendant profits from its sharing of Disclosed Information by one or more of the following mechanisms.

63. First, Defendant earns sales revenue by more effectively advertising its own products on other websites. Defendant's online advertising efforts become more effective when they allow Third Parties to intercept patients' online communications and bundle this information with other information the platforms collected while the patient browsed other sites. If a patient navigates to Defendant's website to explore a product or support program, but ultimately does not enroll or make a purchase, they might then see ads for Fullscript supplements on other websites or while consuming other electronic media. These "retargeting" ads are made possible because Defendant allowed the advertising platforms to silently observe what the patient did while on Defendant's website. Those advertising platforms can then serve Fullscript ads to the same patients who visited Defendant's website.

64. Second, Defendant receives payments from Third Parties in exchange for those Third Parties' placement of Trackers and related cookies on the Defendant's website. Third Parties may pay

[17] *See* Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, Time, (Jan. 9, 2017, at 9:00 a.m.) https://time.com/4588104/medical-data-industry/.

Defendant to install their cookies and Trackers, because cookies and Trackers allow advertisers to serve ads that are customized to the patient's, identity, interests, and medical conditions.

65. Third, Defendant receives a service or services from the Third Parties either for free or at a discounted price. The service may be a technological tool embedded in the website, such as tools to improve functionality or to monitor website usage and performance.

66. Fourth, Defendant receives the ability to purchase ad space on other websites at a reduced price or at a greater value for the same price.

67. Plaintiffs anticipate learning the precise mechanism(s) by which Defendant profits from installation and deployment of the Trackers, including additional means by which Defendant profits from the technologies described herein, through discovery.

## VI. Defendant's Disclosure Violates Standards of Conduct in the HealthCare Industry.

68. Information about a person's physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of medical information can have serious consequences, including discrimination in the workplace and denial of insurance coverage. If people do not trust that their medical information will be kept private, they may be less likely to seek medical treatment, which can lead to more serious health problems down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to anyone other than the person's medical provider is necessary to maintain public trust in the healthcare system as a whole.

69. Recognizing these facts, and in order to implement requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), HHS has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect private information like the information Plaintiffs and Class Members communicated on Defendant's website.

70. In its guidance for Marketing, the Department instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, **a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes**. Moreover, covered entities **may not sell**

> **lists of patients to third parties without obtaining authorization from each person on the list**. (Emphasis added). [18]

71. In December 2022, the Office for Civil Rights (OCR) at the U.S. Department of Health and Human Services (HHS) issued a Bulletin to highlight the obligations of HIPAA-covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technology (the "December 2022 Bulletin").[19]

72. Therein, HHS defined tracking technologies, explaining:

> Tracking technologies are used to collect and analyze information about how users interact with regulated entities' website or mobile applications ("apps"). For example, a regulated entity may engage a technology vendor to perform such analysis as part of the regulated entity's health care operations. The HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information (PHI). Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors.[20]

73. In the Bulletin, HHS stated that, "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. For example, **disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures**."[21]

74. Here, Defendant has not only failed to receive patients' "HIPAAA-complaint authorizations," is has ignored their express choice not to authorize disclosure via on Defendant's cookie banner.

---

[18] *Marketing*, U.S. Department of Health and Human Services, (Dec. 3, 2002) https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.

[19] *See* archived version of the December 2022 Bulletin at HHS Office for Civil Rights Issues Bulletin on Requirements under HIPAA for Online Tracking Technologies to Protect the Privacy and Security of Health Information, HHS.gov (Dec. 1, 2022), https://web.archive.org/web/20221201192812/https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Mar. 30, 2024).

[20] *Id.*

[21] *Id. (emphasis added).* On June 20, 2024, in *American Hospital Ass'n, et al. v. Xavier Becerra, et al.*, No. 4:23-cv-01110-P (N.D. Tx., Jun. 20, 2024, Doc. 67), the U.S. District Court for the Northern District of Texas vacated HHS's March 14, 2024 Bulletin as to the "Proscribed Combination," but acknowledged that the Proscribed Combination could be PHI in certain circumstances.

75. Likewise, the Federal Trade Commission ("FTC") agrees that "HIPAA regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to third parties or any other violations of the HIPAA Rules"[22] and that "[t]his is true even if you relied upon a third party to develop your website or mobile app and even if you do not use the information obtained through use of a tracking technology for any marketing purposes." [23]

76. The FTC warns that violation of these rules may result in serious harm, highlighting precisely the condition- and treatment-related information at issue in this case:

> Impermissible disclosures of an individual's personal health information to third parties may result in a wide range of harms to an individual or others. Such disclosures can reveal sensitive information including health conditions, diagnoses, medical treatments, and more. In addition, impermissible disclosures of personal health information may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others.[24]

77. Thus, Defendant's conduct violates HIPAA Rules and engenders serious harms.

78. Defendant's disclosures also violate California's Consumer Privacy Act. *See* Cal. Civ. Code § 1798.100 *et seq*. Pursuant to that statute, "A business that sells or shares consumers' personal information, or that discloses consumers' personal information for a business purpose, shall disclose" that fact to the consumer. *Id*., § 1798.115(c). Here, Defendant failed to provide an accurate disclosure, as required by California law. Defendant professed not to disclose any of Plaintiffs' and Class Members' information via Third Party cookies and tracking technologies, while it in fact did so disclose, in contradiction to Defendant's express representations.

## PLAINTIFF-SPECIFIC FACTUAL ALLEGATIONS

**Plaintiff Kristin Baker**

79. Plaintiff Kristin Baker has used Defendant's website multiple times since 2025 to browse for and order health supplements, most recently in January 2026.

---

[22] *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, Federal Trade Commission (July 20, 2023), available at https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking?utm_source=govdelivery.

[23] *Id.*

[24] *Re: Use of Online Tracking Technologies, U.S. Dep't of Health & Human Services* (July 20, 2023), available at https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf (last visited Apr. 9, 2024).

80. To obtain health supplements, Plaintiff Baker followed the flows on Defendant's website and searched for specific products. During her use of the site, Defendant collected and allowed the interception of at least the following information from Plaintiff Baker, as it does from all patients who use its sites:

a. her email address;

b. her search queries;

c. the pages she visited;

d. the products she viewed;

e. the conditions related to the pages and products that she viewed; and

f. the name of the medical provider who invited her to create an account on the website.

81. On information and belief, Plaintiff Baker was presented with the cookie banner on Defendant's website, and consistent with her normal practice of routinely declining tracking technologies when offered the choice, she opted out of all optional categories.

82. Plaintiff Baker is a Facebook user. After Plaintiff Baker used Defendant's website, targeted advertisements began appearing on Facebook related to the information she input on Defendant's website, including ads that referenced the types of health supplements she was searching for and the health conditions that those supplements are used for.

83. Plaintiff Baker reasonably expected that her online communications with Defendant were confidential, solely between herself and Defendant, and that, as such, those communications would not be transmitted to or intercepted by a Third Party.

84. Plaintiff Baker provided information to Defendant and trusted that the information would be safeguarded according to industry standards, the representations in Defendant's cookie banner and online policies, and the law. Plaintiff Baker reasonably expected that her communications with Defendant were confidential, solely between Plaintiff Baker and Defendant, and that, as such, those communications and any information submitted would not be transmitted to or intercepted by Third Parties.

85. Plaintiff Baker never intended to sell the communications or Disclosed Information, nor would she have permitted it to be made available for sale on the resale market.

86. On information and belief, through the use of cookies and Trackers, Defendant disclosed to Third Parties at least the following information, which Plaintiff Baker provided to Defendant as part of her use of the Fullscript website:

a. her email address;

b. her search queries;

c. the pages she visited;

d. the products she viewed;

e. the conditions related to the pages and products that she viewed;

f. the name of the medical provider who invited her to create an account on the website; and

g. additional identifying information unique to Plaintiff Baker, including her IP address and unique identifying cookies set by Third Parties.

87. Plaintiff Baker accessed Defendant's website at Defendant's direction and encouragement.

88. Plaintiff Baker would not have shared her information with Defendant or used Defendant's website if she had known her information would be shared with Third Parties in violation of Defendant's representations and legal obligations.

89. As a result of Defendant's Disclosure of Plaintiff Baker's Disclosed Information to Third Parties without authorization, Plaintiff Baker was harmed in at least the following ways:

a. loss of privacy;

b. unauthorized disclosure of her communications and Disclosed Information;

c. unauthorized access to her communications and Disclosed Information by Third Parties;

d. Defendant benefited from the use of Plaintiff Baker's communications and Disclosed Information without sharing that benefit with Plaintiff;

e. Lost benefit of her bargain with Defendant, as Plaintiff Baker did not receive the reasonable privacy and data security protections she was promised;

f. Defendant and Third Parties enriched themselves at Plaintiff Baker's expense without sharing the revenue, profit, and/or cost-savings attributable to collecting Plaintiff Baker's communications and Disclosed Information without authorization and sharing it with Third Parties;

g. Defendant profited from collecting and disclosing Plaintiff Baker's communications and Disclosed Information without authorization through one or more mechanisms, as-yet unknown to Plaintiff Baker, which may include: (1) increased payments from the placement of ads on Defendant's website, (2) direct payments from Third Parties, (3) free or reduced cost for services, including services related to the implementation and monitoring of the Defendant's website, and/or (4) the ability to purchase ad space on other websites at a reduced price or at a greater value for the same price;

h. embarrassment, humiliation, frustration, and emotional distress;

i. decreased value of Plaintiff Baker's communications and Disclosed Information; and

j. increased risk of harm resulting from the use and disclosure of her communications and Disclosed Information.

**Plaintiff Stacy Penning**

90. Plaintiff Stacy Penning has used Defendant's website and viewed products on Defendant's website, visiting the site in approximately October 2026.

91. While visiting Defendant's website, Plaintiff Penning followed the flows on Defendant's website and viewed various products. During his use of the site, Defendant collected and allowed the interception of at least the following information from Plaintiff Penning, as it does from all patients who use its sites:

a. his search queries;

b. the pages he visited;

c. the products he viewed; and

d. the conditions related to the pages and products that he viewed.

92. On information and belief, Plaintiff Penning was presented with the cookie banner on Defendant's website, and consistent with his normal practice of routinely declining tracking technologies when offered the choice, he opted out of all optional categories.

93. Plaintiff Penning is a Facebook user. After Plaintiff Penning used Defendant's website, targeted advertisements began appearing on Facebook related to the information he input on Defendant's website and pages he viewed on the website, including ads that referenced the types of health supplements he viewed and the health conditions that those supplements are used for.

94. Plaintiff Penning reasonably expected that his online communications with Defendant were confidential, solely between himself and Defendant, and that, as such, those communications would not be transmitted to or intercepted by a Third Party.

95. Plaintiff Penning provided information to Defendant and trusted that the information would be safeguarded according to industry standards, the representations in Defendant's cookie banner and online policies, and the law. Plaintiff Penning reasonably expected that his communications with Defendant were confidential, solely between Plaintiff Penning and Defendant, and that, as such, those communications and any information submitted would not be transmitted to or intercepted by Third Parties.

96. Plaintiff Penning never intended to sell the communications or Disclosed Information, nor would he have permitted it to be made available for sale on the resale market.

97. On information and belief, through the use of cookies and Trackers, Defendant disclosed to Third Parties at least the following information, which Plaintiff Penning provided to Defendant as part of his use of the Fullscript website:

a. his search queries;

b. the pages he visited;

c. the products he viewed;

d. the conditions related to the pages and products that he viewed; and

e. additional identifying information unique to Plaintiff Penning, including his IP address and unique identifying cookies set by Third Parties.

98. Plaintiff Penning accessed Defendant's website at Defendant's direction and encouragement.

99. Plaintiff Penning would not have shared his information with Defendant or used Defendant's website if he had known his information would be shared with Third Parties in violation of Defendant's representations and legal obligations.

100. As a result of Defendant's Disclosure of Plaintiff Penning's Disclosed Information to Third Parties without authorization, Plaintiff Penning was harmed in at least the following ways:

a. loss of privacy;

b. unauthorized disclosure of his communications and Disclosed Information;

c. unauthorized access to his communications and Disclosed Information by Third Parties;

d. Defendant benefited from the use of Plaintiff Penning's communications and Disclosed Information without sharing that benefit with Plaintiff Penning;

e. lost benefit of his bargain with Defendant, as Plaintiff Penning did not receive the reasonable privacy and data security protections he was promised;

f. Defendant and Third Parties enriched themselves at Plaintiff Penning's expense without sharing the revenue, profit, and/or cost-savings attributable to collecting Plaintiff Penning's communications and Disclosed Information without his authorization and sharing it with Third Parties;

g. Defendant profited from collecting and disclosing Plaintiff Penning's communications and Disclosed Information without authorization through one or more mechanisms, as-yet unknown to Plaintiff Penning, which may include: (1) increased payments from the placement of ads on Defendant's website, (2) direct payments from Third Parties, (3) free or reduced cost for services, including services related to the implementation and monitoring of the Defendant's website, and/or (4) the ability to purchase ad space on other websites at a reduced price or at a greater value for the same price;

h. embarrassment, humiliation, frustration, and emotional distress;

i. decreased value of Plaintiff Penning's communications and Disclosed Information; and

j. increased risk of harm resulting from the use and disclosure of his communications and Disclosed Information.

**TOLLING, CONCEALMENT, AND ESTOPPEL**

101. The applicable statutes of limitation have been tolled because of Defendant's knowing and active concealment and denial of the facts alleged herein.

102. Defendant actively concealed its use of cookies and Trackers by providing an illusory opt-out function that did not, in fact, accomplish an opt-out. Defendant surreptitiously incorporated cookies and Trackers into its website while explicitly denying it was doing so to Plaintiffs and members of the putative Class.

103. Plaintiffs and putative Class Members could not have discovered Defendant's conduct, because Defendant actively concealed its conduct and misled Plaintiffs and putative Class Members via its deceptive cookie banner.

104. All applicable statutes of limitation have also been tolled by operation of the discovery rule as well as the doctrine of continuing tort. Defendant's illegal interception and disclosure of Plaintiffs' and the Class's communications and Disclosed Information has continued unabated. Further, Defendant was under a duty to disclose the nature and significance of its data collection practices but did not do so. Defendant is therefore estopped from relying on any statute of limitations defenses.

**CLASS ACTION ALLEGATIONS**

105. Plaintiffs bring this statewide class action on behalf of themselves and all others similarly situated pursuant to Cal. Civ. Proc. § 382.

106. Plaintiffs seek to represent the following Class:

> All California who declined consent to optional cookies and other tracking technologies via Defendant's cookie banner and whose information was disclosed by Defendant to Third Parties.

107. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

108. Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

109. The proposed Class is a well-defined community of interest, and this action satisfies the requirements for class certification found in the relevant case law.

110. Questions of law and fact common to the Class predominate over questions affecting only individual Class Members. Common questions include:

a. whether Defendant disclosed Class Members' communications or Disclosed Information to Third Parties;

b. whether Class Members consented to Defendant's disclosure of their communications or Disclosed Information;

c. whether Defendant owed duties to Plaintiffs and Class Members to protect their communications or Disclosed Information;

d. whether Defendant breached its duty to protect Plaintiffs' and Class Members' communications or Disclosed Information;

e. whether Defendant's disclosure of Plaintiffs' and Class Members' communications or Disclosed Information to Third Parties violated laws, contracts, and industry standards;

f. whether Defendant's failure to allow patients a meaningful opportunity to opt out of sharing with Third Parties violated laws, contracts, and industry standards;

g. whether Defendant's conduct resulted in or was the actual cause of the disclosure of Plaintiffs' and Class Members' communications or Disclosed Information;

h. whether Defendant's conduct resulted in or was the proximate cause of the disclosure of Plaintiffs' and Class Members' communications or Disclosed Information;

i. whether Defendant has a contractual obligation to protect Plaintiffs' and Class Members' communications or Disclosed Information and whether it complied with such contractual obligation;

j. whether Defendant has a duty of confidence and whether it complied with such obligation; and

k. whether, as a result of Defendant's conduct, Plaintiffs and Class Members are entitled to injunctive, equitable, declaratory, monetary, statutory, and/or other relief, and, if so, the nature of such relief.

111. Plaintiffs' claims are typical of those of other Class Members. Defendant installed cookies and Trackers on Plaintiffs' browsers and the browsers of absent Class Members despite Plaintiffs and Class Member expressly opting out of optional tracking technologies. Defendant intercepted and shared sensitive private information that Plaintiffs and Class Members provided to Defendant.

112. Plaintiffs can adequately represent the proposed Class. They are prepared to serve as Class representatives, and their counsel are competent and experienced in matters of this type.

113. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged. If the class action device were not used, Defendant would necessarily gain an unconscionable advantage because it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources. Moreover, the costs of individual suits could unreasonably consume the amounts that would be recovered, whereas proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged. Finally, individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

114. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

115. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

## COUNT 1
## CALIFORNIA INVASION OF PRIVACY ACT
## CAL PEN. CODE § 631

116. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

117. The California Legislature enacted CIPA after finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Pen. Code § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id*.

118. Cal. Pen. Code § 631 prohibits the following conduct by a defendant, if done "by means of any machine, instrument, contrivance, or in any other manner":

a. "Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system," *or*

b. "Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state," *or*

c. "Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained," *or*

d. "Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

119. Defendant engaged in all four of the above-listed forms of prohibited conduct.

120. Section 631(a) applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, No. 15-CV-04062-LHK, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google Inc.*, No. C 06-05289 WHA, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history); *Javier v. Assurance IQ, LLC*, No. 21-

16351, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

121. Defendant's website and the tracking technologies Defendant intentionally installed on it are prohibited by CIPA, as they constitute a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

122. By use of cookies and tracking technology, Defendant used a recording device to record the confidential communications in transit, including Disclosed Information, without the consent of Plaintiffs or Class Members, and transmitted such information to Third Parties.

123. Defendant aided, agreed, and conspired with Third Parties to secretly record, use, intercept, and transmit the Disclosed Information.

124. The intercepting devices that Defendant employed or aided in the employment of include, but are not limited to:

a. the computers and servers to which Plaintiffs' and Class Members' communications and information were disclosed;

b. Plaintiffs' and Class Members' personal computing devices;

c. Plaintiffs' and Class Members' web browsers;

d. Plaintiffs' and Class Members' browser-managed files;

e. cookies;

f. other pixels, Trackers, and/or tracking technology installed on Defendant's website and/or server, or on Plaintiffs' and Class Members' browsers;

g. Defendant's computer servers;

h. Third Party source code used by Defendant; and

i. Third Party computer servers.

125. The relevant Trackers and cookies transmitted each of a website consumers' actions to Third Parties alongside and contemporaneously with the consumer initiating the communication. Thus, Plaintiffs' and Class Members' communications were intercepted in transit to the intended recipient (Defendant) before they reached Defendant's servers.

126. Defendant willingly facilitated the Third Parties' interception and collection of Plaintiffs' and Class Members' communications or Disclosed Information, and the Third Parties' use of their communications or Disclosed Information, by embedding the Trackers and cookies on its website. Moreover, Defendant had full control over these Trackers and cookies, including which webpages contained the pixels, what information was tracked and shared, and how events were categorized prior to transmission.

127. Defendant gave substantial assistance to the Third Parties in violating the privacy rights of Defendant's customers and other consumers, even though Defendant's conduct constituted a breach of the duties that it owed, including the duty healthcare providers owe to their patients. Defendant knew that the installation of the Trackers and cookies on its website would result in the unauthorized disclosure of customers' communications to Third Parties.

128. Defendant assisted Third Parties in reading, learning, and exploiting the Disclosed Information. Defendant disclosed details about website visitors to Third Parties, as described above.

129. Plaintiffs and Class Members seek statutory damages under Cal. Pen. Code § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Class in an amount to be proven at trial, as well as injunctive or other equitable relief. Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT 2**
**CALIFORNIA INVASION OF PRIVACY ACT**
**CAL PEN. CODE § 632**

130. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

131. CIPA § 632(a) prohibits "intentionally and without the consent of all parties to a confidential communication, us[ing a] recording device to eavesdrop upon or record the confidential communication."

132. By installing and facilitating deployment of cookies and Trackers despite Class Members' explicit instructions not to, Defendant used a recording device to record confidential communications, including the Disclosed Information described above.

133. Defendant also aided and assisted Third Parties to eavesdrop and wiretap Plaintiffs' and Class Members' communications in violation of Section 632 by facilitating, permitting, and endorsing their use of Trackers and cookies to surreptitiously record and read communications between Class Members and Defendant.

134. The recording devices used by Defendant include, but are not limited to, the devices described in Count 1 above.

135. Plaintiffs and Class Members seek statutory damages under Cal. Pen. Code § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Class in an amount to be proven at trial, as well as injunctive or other equitable relief. Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT 3**
**CALIFORNIA INVASION OF PRIVACY ACT**
**CAL. PEN. CODE § 638.51 *ET SEQ***

136. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

137. Section 638.51 of CIPA prohibits the installation or use of "a pen register or trap and trace device without first obtaining a court order." Cal. Pen. Code § 638.51(a).

138. Defendant repeatedly violated CIPA § 638.51(a) by installing and using the Trackers without a court order and without any valid consent from consumers. Defendant's continued use of Trackers after a consumer opted out, as described in detail above, demonstrates that no valid consent was obtained. Instead, Defendant relied on a knowingly deceptive interface that falsely conveyed consumer control while continuing to intercept and transmit private communications.

139. An "electronic communication" is defined as "any transfer of signs, signals, writings, images, sounds, data, or intelligence of any nature in whole or in part by a wire, radio, electromagnetic, photoelectric, or photo-optical system[.]" Cal. Pen. Code § 629.51(a)(2).

140. All communications between individual Plaintiffs or Class Members and Defendant qualify as protected communications under CIPA because each communication is made using personal computing devices (*e.g.*, computers, smartphones, tablets) that send and receive communications in whole or in part

through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

141. California Penal Code § 638.50(b) defines a "pen register" as "a device or process that records or decodes dialing, routing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

142. Trackers and cookies are "pen registers" under Section 638.50(b) of CIPA because they record "routing, addressing, or signaling information" transmitted by the devices of visitors to Defendant's website. Cal. Pen. Code § 638.50(b).

143. California Penal Code § 638.50(c) defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."

144. The Trackers are also "trap and trace devices" under Section 638.50(c) because they "capture the incoming electronic or other impulses that identify . . . dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication[.]" Cal. Pen. Code § 638.50(c).

145. Defendant installed the Trackers on its website and used them to capture and transmit addressing information, including Plaintiffs' and Class Members' IP addresses and other unique identifiers to Third Parties.

146. Plaintiff and Class Members did not provide their consent prior to Defendant's installation and use of the Trackers and cookies. On information and belief, Defendant also did not obtain a court order to install or use the Trackers and cookies.

147. Under California Penal Code § 637.2, Plaintiffs and Class Members have been injured by Defendant's violations of California Penal Code § 638.51(a), and each seek statutory damages of $5,000 per violation.

148. Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT 4**
**BREACH OF CONTRACT**

149. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

150. Defendant's representations to Plaintiffs and Class Members regarding its use of cookies and tracking technology, including the representations in its cookie banner, constitute a contract. By declining consent to optional tracking technologies, Plaintiffs and Class Members indicated their acceptance of Defendant's express offer not to employ cookie and tracking technologies while they navigated Defendant's website. In consideration for Defendant's promise, Plaintiffs and Class Members continued to use Defendant's website and products, in reliance on the representations Defendant made in its cookie banner.

151. Plaintiffs and Class Members would not have used Defendant's website or provided their personal information to Defendant, including Disclosed Information, in the absence of the contract binding them and Defendant. Defendant's promised safeguarding of the Disclosed Information was critical to realize the intent of the parties.

152. As detailed above, Defendant breached its contracts with Plaintiffs and Class Members by disclosing their information Third Parties in direct contravention of the cookie banner.

153. As a direct and proximate result of Defendant's breach of contract, Plaintiffs and Class Members sustained actual losses and damages as described in detail above.

**COUNT 5**
**CALIFORNIA UNFAIR COMPETITION LAW,**
**CAL. BUS. & PROF. CODE § 17200, *ET SEQ.***

154. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

155. The California Business and Professions Code § 17201, *et seq*. prohibits acts of unfair competition, which includes unlawful business practices.

156. Defendant's business acts and practices are "unlawful" under the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et. seq*. (the "UCL") because, as alleged above, Defendant violated

California common law, HIPAA, the California Consumer Privacy Act, Cal. Civ. Code § 1798.100 *et seq.*, and the other laws and causes of action alleged herein.

157. When using Defendant's website and services, Plaintiffs and Class Members relied on Defendant's status as a trusted healthcare institution and the representations in its cookie banner.

158. Inconsistent with its representations and role, Defendant disclosed Plaintiffs' and Class Members' Disclosed Information to Third Parties without their consent. Thus, Defendant represented that its services have characteristics, uses, or benefits that they do not have and represented that its services are of a particular standard, quality, or grade when they were not, in violation of Cal. Civil Code § 1770.

159. Had Plaintiffs and Class Members known that Defendant would intercept, collect, and transmit their communications or Disclosed Information to Third Parties, Plaintiffs and Class Members would not have used Defendant's services.

160. Plaintiffs and Class Members have a property interest in their communications or Disclosed Information. By surreptitiously collecting and otherwise misusing Plaintiffs' and Class Members' communications or Disclosed Information, Defendant has taken property from Plaintiffs and Class Members without providing just (or indeed any) compensation.

161. By deceptively collecting, using, and sharing Plaintiffs' and Class Members' communications or Disclosed Information with Third Parties for Third Party use, Defendant has taken money or property from Plaintiffs and Class Members. Accordingly, Plaintiffs seek restitution on behalf of themselves and the Class.

162. Defendant's business acts and practices also meet the unfairness prong of the UCL according to all three theories of unfairness.

163. Plaintiffs and Class Members have lost money and property due to Defendant's conduct in violation of the UCL. Disclosed Information such as that which Defendant collected and transmitted to Third Parties has objective monetary value. Companies are willing to pay for such Disclosed Information, like the information Defendant unlawfully collected and transmitted to Third Parties.

164. By deceptively collecting, using, and sharing Plaintiffs' and Class Members' communications or Disclosed Information with Third Parties, and by allowing Third Parties to use their

Disclosed Information, Defendant has taken money and/or property from Plaintiffs and Class Members. Accordingly, Plaintiffs seek restitution on behalf of themselves and the Class.

165. As a direct and proximate result of Defendant's unfair and unlawful methods and practices of competition, Plaintiffs and Class Members suffered actual damages, including, but not limited to, the loss of the value of their Disclosed Information.

166. As a direct and proximate result of its unfair and unlawful business practices, Defendant has each been unjustly enriched and should be required to make restitution to Plaintiffs and Class Members pursuant to Section 17203 and 17204 of the California Business & Professions Code, disgorgement of all profits accruing to Defendant because of its unlawful and unfair business practices, declaratory relief, attorney fees and costs (pursuant to Cal. Code Civ. Proc. §1021.5), and injunctive or other equitable relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, request judgment in their favor and the following relief:

a. for an Order certifying this action as a class action and appointing Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

b. for an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

c. for an award of punitive damages, as allowable by law;

d. for equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Disclosed Information and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

e. for an Order declaring the rights and obligations of the parties, including, without limitation, that Defendant owes a legal duty to its customers to secure their Disclosed Information and that Defendant violates this legal duty by disclosing its customers and website visitors' Disclosed Information to unaffiliated Third Parties;

f. for equitable relief compelling Defendant to adopt appropriate methods and policies with respect to consumer data collection, storage, and safety and to disclose with specificity the

type of communications or Disclosed Information compromised and unlawfully disclosed to Third Parties;

g. for equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

h. for an award of reasonable attorneys' fees and costs under the laws outlined above, the common fund doctrine, and any other applicable law, including attorney's fees under Cal. Code Civ. Proc. § 1021.5;

i. costs and any other expenses, including expert witness fees incurred by Plaintiffs in connection with this action;

j. pre- and post-judgment interest on any amounts awarded; and

k. such other and further relief as this court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs further demand a trial by jury on all issues so triable.

Dated: April 30, 2026

**LYNCH CARPENTER, LLP**

By: */s/ (Eddie) Jae K. Kim*

(Eddie) Jae K. Kim (SBN 236805)
ekim@lcllp.com
Tiffine E. Malamphy (SBN 312239)
tiffine@lcllp.com
9171 Towne Centre Dr, Ste 180
San Diego, CA 92122
Telephone: (619) 762-1910
Facsimile: (858) 313-1850

*Attorneys for Plaintiffs and Proposed Class Counsel*

# EXHIBIT 5

**CM-010**

ATTORNEY OR PARTY WITHOUT ATTORNEY STATE BAR NUMBER: 236805
NAME: (Eddie) Jae K. Kim
FIRM NAME: LYNCH CARPENTER, LLP
STREET ADDRESS: 9171 Towne Centre Drive, Suite 180
CITY: San Diego STATE: CA ZIP CODE: 92122
TELEPHONE NO.: (619) 762-1910 FAX NO.: (858) 313- 1850
EMAIL ADDRESS: ekim@lcllp.com
ATTORNEY FOR (*name*): Plaintiffs Kristin Baker and Stacy Penning

*FOR COURT USE ONLY*

**Electronically FILED by Superior Court of California, County of Los Angeles 4/30/2026 1:51 PM David W. Slayton, Executive Officer/Clerk of Court, By A. Radillo, Deputy Clerk**

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: 111 North Hill Street
CITY AND ZIP CODE: Los Angeles, 90012
BRANCH NAME: Stanley Mosk Courthouse

CASE NAME:
Baker, et al v. Healthy Web Inc., et al

## CIVIL CASE COVER SHEET

[x] **Unlimited** (Amount demanded exceeds $35,000)
[ ] **Limited** (Amount demanded is $35,000 or less)

**Complex Case Designation**
[ ] Counter [ ] Joinder
Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402)

CASE NUMBER: 26STCV13931
JUDGE:
DEPT.:

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Asbestos**
[ ] Asbestos (04)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[x] Business tort/Unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Employment Development Department (EDD)**
[ ] EDD decision review (48)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.404)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Comprehensive groundwater adjudication (47)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (*not specified above*) (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (*not specified above*) (43)



→

2. Is this case complex under rule 3.400 of the California Rules of Court? [x] Yes [ ] No

If the case is complex, mark the factors requiring exceptional judicial management:

a. [ ] Large number of separately represented parties
b. [x] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
c. [x] Substantial amount of documentary evidence
d. [ ] Large number of witnesses
e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):*

a. [x] monetary
b. [x] nonmonetary; declaratory or injunctive relief
c. [x] punitive

4. Number of causes of action *(specify):* 5: Violation of Pen. Code §§631, 632, 638.51, Bus. & Prof. § 17200 & Breach of Contract

5. Is this case a class action suit? [x] Yes [ ] No

6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: April 30, 2026

(Eddie) Jae K. Kim
(TYPE OR PRINT NAME)

*/s/ (Eddie) Jae K. Kim*
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**

- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 of the California Rules of Court or a complex case, this cover sheet will be used for statistical purposes only.

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on pages 1 and 2. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 of the California Rules of Court is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $35,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**SEE PAGE 3 FOR INFORMATION PURPOSES ONLY.**

## CASE TYPES AND EXAMPLES

**Auto Tort**
- Auto (22)–Personal Injury/Property Damage/ Wrongful Death
- Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Asbestos**
- Asbestos (04)
  - Asbestos Property Damage
  - Asbestos Personal Injury/Wrongful Death

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
- Product Liability *(not asbestos or toxic/ environmental)* (24)
- Medical Malpractice (45)
  - Medical Malpractice–Physicians & Surgeons
  - Other Professional Health Care Malpractice
- Other PI/PD/WD (23)
  - Premises Liability (e.g., slip and fall)
  - Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  - Intentional Infliction of Emotional Distress
  - Negligent Infliction of Emotional Distress
  - Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
- Business Tort/Unfair Business Practice (07)
- Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
- Defamation (e.g., slander, libel) (13)
- Fraud (16)
- Intellectual Property (19)
- Professional Negligence (25)
  - Legal Malpractice
  - Other Professional Malpractice *(not medical or legal)*
- Other Non-PI/PD/WD Tort (35)

**Employment**
- Wrongful Termination (36)
- Other Employment (15)

**Contract**
- Breach of Contract/Warranty (06)
  - Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  - Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  - Negligent Breach of Contract/Warranty
  - Other Breach of Contract/Warranty
- Collections (e.g., money owed, open book accounts) (09)
  - Collections Case–Seller Plaintiff
- Other Promissory Note/Collections Case
- Insurance Coverage *(not provisionally complex)* (18)
  - Auto Subrogation
  - Other Coverage
- Other Contract (37)
  - Contractual Fraud
  - Other Contract Dispute

**Real Property**
- Eminent Domain/Inverse Condemnation (14)
- Wrongful Eviction (33)
- Other Real Property (e.g., quiet title) (26)
  - Writ of Possession of Real Property
  - Mortgage Foreclosure
  - Quiet Title
  - Other Real Property *(not eminent domain, landlord-tenant, or foreclosure)*

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
- Asset Forfeiture (05)
- Petition re Arbitration Award (11)
- Writ of Mandate (02)
  - Writ–Administrative Mandamus
  - Writ–Mandamus on Limited Court Case Matter
  - Writ–Other Limited Court Case Review
- Other Judicial Review (39)
  - Review of Health Officer Order
  - Notice of Appeal–Labor Commissioner Appeals

**Employment Development Department (EDD)**
- EDD Decision Review (48) *(if the case involves an Employment Development Department decision, check this item instead of Wrongful Termination or Other Employment)*

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- Antitrust/Trade Regulation (03)
- Construction Defect (10)
- Claims Involving Mass Tort (40)
- Securities Litigation (28)
- Environmental/Toxic Tort (30)
- Comprehensive Groundwater Adjudication (47)
- Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
- Enforcement of Judgment (20)
  - Abstract of Judgment (Out of County)
  - Confession of Judgment *(non-domestic relations)*
  - Sister-State Judgment
  - Administrative Agency Award *(not unpaid taxes)*
  - Petition/Certification of Entry of Judgment on Unpaid Taxes
  - Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
- RICO (27)
- Other Complaint *(not specified above)* (42)
  - Declaratory Relief Only Injunctive Relief Only *(non-harassment)*
  - Mechanic's Lien
  - Other Commercial Complaint Case *(non-tort/non-complex)*
  - Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
- Partnership and Corporate Governance (21)
- Other Petition *(not specified above)* (43)
  - Civil Harassment
  - Workplace Violence
  - Elder/Dependent Adult Abuse
  - Election Contest
  - Petition for Name Change
  - Petition for Relief From Late Claim
  - Other Civil Petition

# EXHIBIT 6

| SHORT TITLE: Baker, et al v. Healthy Web Inc., et al | CASE NUMBER 26STCV13931 |
|---|---|

# CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court.**

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Electronically FILED by Superior Court of California, County of Los Angeles 4/30/2026 1:51 PM David W. Slayton, Executive Officer/Clerk of Court, By A. Radillo, Deputy Clerk**

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

**Applicable Reasons for Choosing Court Filing Location (Column C)**

1. Class actions must be filed in the Stanley Mosk Courthouse, Central District.
2. Permissive filing in central district.
3. Location where cause of action arose.
4. Mandatory personal injury filing in North District.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.
11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection, or personal injury).

| | A<br>Civil Case Cover Sheet Category No. | B<br>Type of Action (Check only one) | C<br>Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| Auto Tort | Auto (22) | ☐ A7100 Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| | Uninsured Motorist (46) | ☐ A7110 Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1, 4, 11 |
| Other Personal Injury/ Property Damage/ Wrongful Death Tort | Asbestos (04) | ☐ A6070 Asbestos Property Damage<br>☐ A7221 Asbestos - Personal Injury/Wrongful Death | 1, 11<br>1, 11 |
| | Product Liability (24) | ☐ A7260 Product Liability (not asbestos or toxic/environmental) | 1, 4, 11 |
| | Medical Malpractice (45) | ☐ A7210 Medical Malpractice - Physicians & Surgeons<br>☐ A7240 Other Professional Health Care Malpractice | 1, 4, 11<br>1, 4, 11 |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250 Premises Liability (e.g., slip and fall)<br>☐ A7230 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.)<br>☐ A7270 Intentional Infliction of Emotional Distress<br>☐ A7220 Other Personal Injury/Property Damage/Wrongful Death | 1, 4, 11<br>1, 4, 11<br>1, 4, 11<br>1, 4, 11 |

| SHORT TITLE: Baker, et al v. Healthy Web Inc., et al | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet Category No. | B<br>Type of Action (Check only one) | C Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| Non-Personal Injury/ Property Damage/ Wrongful Death Tort | Business Tort (07) | ☑ A6029 Other Commercial/Business Tort (not fraud/breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ A6005 Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ A6010 Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ A6013 Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ A6017 Legal Malpractice<br>☐ A6050 Other Professional Malpractice (not medical or legal) | 1, 2, 3<br>1, 2, 3 |
| | Other (35) | ☐ A6025 Other Non-Personal Injury/Property Damage tort | 1, 2, 3 |
| Employment | Wrongful Termination (36) | ☐ A6037 Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ A6024 Other Employment Complaint Case<br>☐ A6109 Labor Commissioner Appeals | 1, 2, 3<br>10 |
| Contract | Breach of Contract/ Warranty (06) (not insurance) | ☐ A6004 Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction)<br>☐ A6008 Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence)<br>☐ A6019 Negligent Breach of Contract/Warranty (no fraud)<br>☐ A6028 Other Breach of Contract/Warranty (not fraud or negligence) | 2, 5<br>2, 5<br>1, 2, 5<br>1, 2, 5 |
| | Collections (09) | ☐ A6002 Collections Case-Seller Plaintiff<br>☐ A6012 Other Promissory Note/Collections Case<br>☐ A6034 Collections Case-Purchased Debt (Charged Off Consumer Debt Purchased on or after January 1, 2014) | 5, 6, 11<br>5, 11<br>5, 6, 11 |
| | Insurance Coverage (18) | ☐ A6015 Insurance Coverage (not complex) | 1, 2, 5, 8 |
| | Other Contract (37) | ☐ A6009 Contractual Fraud<br>☐ A6031 Tortious Interference<br>☐ A6027 Other Contract Dispute(not breach/insurance/fraud/negligence) | 1, 2, 3, 5<br>1, 2, 3, 5<br>1, 2, 3, 8, 9 |
| Real Property | Eminent Domain/Inverse Condemnation (14) | ☐ A7300 Eminent Domain/Condemnation Number of parcels______ | 2, 6 |
| | Wrongful Eviction (33) | ☐ A6023 Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ A6018 Mortgage Foreclosure<br>☐ A6032 Quiet Title<br>☐ A6060 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6<br>2, 6<br>2, 6 |
| Unlawful Detainer | Unlawful Detainer-Commercial (31) | ☐ A6021 Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Residential (32) | ☐ A6020 Unlawful Detainer-Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2, 6, 11 |
| | Unlawful Detainer-Drugs (38) | ☐ A6022 Unlawful Detainer-Drugs | 2, 6, 11 |

| SHORT TITLE: Baker, et al v. Healthy Web Inc., et al | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet Category No. | B<br>Type of Action<br>(Check only one) | C Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| Judicial Review | Asset Forfeiture (05) | ☐ A6108 Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ A6115 Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ A6151 Writ - Administrative Mandamus<br>☐ A6152 Writ - Mandamus on Limited Court Case Matter<br>☐ A6153 Writ - Other Limited Court Case Review | 2, 8<br>2<br>2 |
| | Other Judicial Review (39) | ☐ A6150 Other Writ /Judicial Review | 2, 8 |
| Provisionally Complex Litigation | Antitrust/Trade Regulation (03) | ☐ A6003 Antitrust/Trade Regulation | 1, 2, 8 |
| | Construction Defect (10) | ☐ A6007 Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ A6006 Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ A6035 Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ A6036 Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014 Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| Enforcement of Judgment | Enforcement of Judgment (20) | ☐ A6141 Sister State Judgment<br>☐ A6160 Abstract of Judgment<br>☐ A6107 Confession of Judgment (non-domestic relations)<br>☐ A6140 Administrative Agency Award (not unpaid taxes)<br>☐ A6114 Petition/Certificate for Entry of Judgment on Unpaid Tax<br>☐ A6112 Other Enforcement of Judgment Case | 2, 5, 11<br>2, 6<br>2, 9<br>2, 8<br>2, 8<br>2, 8, 9 |
| Miscellaneous Civil Complaints | RICO (27) | ☐ A6033 Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030 Declaratory Relief Only<br>☐ A6040 Injunctive Relief Only (not domestic/harassment)<br>☐ A6011 Other Commercial Complaint Case (non-tort/non-complex)<br>☐ A6000 Other Civil Complaint (non-tort/non-complex) | 1, 2, 8<br>2, 8<br>1, 2, 8<br>1, 2, 8 |
| Miscellaneous Civil Petitions | Partnership Corporation Governance (21) | ☐ A6113 Partnership and Corporate Governance Case | 2, 8 |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121 Civil Harassment<br>☐ A6123 Workplace Harassment<br>☐ A6124 Elder/Dependent Adult Abuse Case<br>☐ A6190 Election Contest<br>☐ A6110 Petition for Change of Name/Change of Gender<br>☐ A6170 Petition for Relief from Late Claim Law<br>☐ A6100 Other Civil Petition | 2, 3, 9<br>2, 3, 9<br>2, 3, 9<br>2<br>2, 7<br>2, 3, 8<br>2, 9 |

| SHORT TITLE: Baker, et al v. Healthy Web Inc., et al | CASE NUMBER |
|---|---|

**Step 4: Statement of Reason and Address**: Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address which is the basis for the filing location, including zip code. (No address required for class action cases).

| REASON: ☑ 1. ☐ 2. ☐ 3. ☐ 4. ☐ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11. | | | ADDRESS: Print Your Current Street Address Here |
|---|---|---|---|
| CITY: Print Your City Name Here | STATE: CA | ZIP CODE: Zip | |

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the Central District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., §392 et seq., and Local Rule 2.3(a)(1)(E)].

Dated: 4/30/2026

*/s/ (Eddie) Jae K. Kim*
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.
2. If filing a Complaint, a completed Summons form for issuance by the Clerk.
3. Civil Case Cover Sheet, Judicial Council form CM-010.
4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 02/16).
5. Payment in full of the filing fee, unless there is court order for waiver, partial or scheduled payments.
6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.
7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

# EXHIBIT 7

*Superior Court of California, County of Los Angeles*

**ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE**

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS MUST SERVE THIS ADR INFORMATION PACKAGE ON ANY NEW PARTIES NAMED TO THE ACTION WITH THE CROSS-COMPLAINT.**

**WHAT IS ADR?**

Alternative Dispute Resolution (ADR) helps people find solutions to their legal disputes without going to trial. The Court offers a variety of ADR resources and programs for various case types.

**TYPES OF ADR**

- **Negotiation.** Parties may talk with each other about resolving their case at any time. If the parties have attorneys, they will negotiate for their clients.

- **Mediation.** Mediation may be appropriate for parties who want to work out a solution but need help from a neutral third party. A mediator can help the parties reach a mutually acceptable resolution. Mediation may be appropriate when the parties have communication problems and/or strong emotions that interfere with resolution. Mediation may not be appropriate when the parties want a public trial, lack equal bargaining power, or have a history of physical or emotional abuse.

- **Arbitration.** Less formal than a trial, parties present evidence and arguments to an arbitrator who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision.

- **Settlement Conferences.** A judge or qualified settlement officer assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. Mandatory settlement conferences may be ordered by a judicial officer. In some cases, voluntary settlement conferences may be requested by the parties.

**ADVANTAGES OF ADR**

- **Save time and money.** Utilizing ADR methods is often faster than going to trial and parties can save on court costs, attorney's fees, and other charges.
- **Reduce stress and protect privacy.** ADR is conducted outside of a courtroom setting and does not involve a public trial.
- **Help parties maintain control.** For many types of ADR, parties may choose their ADR process and provider.

**DISADVANTAGES OF ADR**

- **Costs.** If the parties do not resolve their dispute, they may have to pay for ADR, litigation, and trial.
- **No Public Trial.** ADR does not provide a public trial or decision by a judge or jury.

**WEBSITE RESOURCES FOR ADR**

- **Los Angeles Superior Court ADR website:** www.lacourt.org/ADR
- **California Courts ADR website:** www.courts.ca.gov/programs-adr.htm

**Los Angeles Superior Court ADR Programs for Unlimited Civil (cases valued over $35,000)**

Litigants should closely review the requirements for each program and the types of cases served.

- **Civil Mediation Vendor Resource List.** Litigants in unlimited civil cases may use the Civil Mediation Vendor Resource List to arrange voluntary mediations without Court referral or involvement. The Resource List includes organizations that have been selected through a formal process that have agreed to provide a limited number of low-cost or no-cost mediation sessions with attorney mediators or retired judges. Organizations may accept or decline cases at their discretion. Mediations are scheduled directly with these organizations and are most often conducted through videoconferencing. The organizations on the Resource List target active civil cases valued between $50,000-$250,000, though cases outside this range may be considered. *For more information and to view the list of vendors and their contact information, download the Resource List Flyer and FAQ Sheet at www.lacourt.org/ADR/programs.html.*
  **RESOURCE LIST DISCLAIMER:** The Court provides this list as a public service. The Court does not endorse, recommend, or make any warranty as to the qualifications or competency of any provider on this list. Inclusion on this list is based on the representations of the provider. The Court assumes no responsibility or liability of any kind for any act or omission of any provider on this list.

- **Mediation Volunteer Panel (MVP).** Unlimited civil cases referred by judicial officers to the Court's Mediation Volunteer Panel (MVP) are eligible for three hours of virtual mediation at no cost with a qualified mediator from the MVP. Through this program, mediators volunteer preparation time and three hours of mediation at no charge. If the parties agree to continue the mediation after three hours, the mediator may charge their market hourly rate. When a case is referred to the MVP, the Court's ADR Office will provide information and instructions to the parties. The Notice directs parties to meet and confer to select a mediator from the MVP or they may request that the ADR Office assign them a mediator. The assigned MVP mediator will coordinate the mediation with the parties. *For more information or to view MVP mediator profiles, visit the Court's ADR webpage at www.lacourt.org/ADR or email ADRCivil@lacourt.org.*

- **Mediation Center of Los Angeles (MCLA) Referral Program.** The Court may refer unlimited civil cases to mediation through a formal contract with the Mediation Center of Los Angeles (MCLA), a nonprofit organization that manages a panel of highly qualified mediators. Cases must be referred by a judicial officer or the Court's ADR Office. The Court's ADR Office will provide the parties with information for submitting the case intake form for this program. MCLA will assign a mediator based on the type of case presented and the availability of the mediator to complete the mediation in an appropriate time frame. MCLA has a designated fee schedule for this program. *For more information, contact the Court's ADR Office at ADRCivil@lacourt.org.*

- **Resolve Law LA (RLLA) Virtual Mandatory Settlement Conferences (MSC).** Resolve Law LA provides three-hour virtual Mandatory Settlement Conferences at no cost for personal injury and non-complex employment cases. Cases must be ordered into the program by a judge pursuant to applicable Standing Orders issued by the Court and must complete the program's online registration process. The program leverages the talent of attorney mediators with at least 10 years of litigation experience who volunteer as settlement officers. Each MSC includes two settlement officers, one each from the plaintiff and defense bars. Resolve Law LA is a joint effort of the Court, Consumer Attorneys Association of Los Angeles County (CAALA), Association of Southern California Defense Counsel (ASCDC), Los Angeles Chapter of the American Board of Trial Advocates (LA-ABOTA), Beverly Hills Bar Foundation (BHBF), California Employment Lawyers Association (CELA), and Los Angeles County Bar Association (LACBA). *For more information, visit https://resolvelawla.com.*

- **Judicial Mandatory Settlement Conferences (MSCs).** Judicial MSCs are ordered by the Court for unlimited civil cases and may be held close to the trial date or on the day of trial. The parties and their attorneys meet with a judicial officer who does not make a decision, but who instead assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For more information, visit https://www.lacourt.org/division/civil/CI0047.aspx.

**Los Angeles Superior Court ADR Programs for Limited Civil (cases valued below $35,000)**
Litigants should closely review the requirements for each program and the types of cases served.

- **Dispute Resolution Program Act (DRPA) Day-of-Hearing Mediation.** Through the Dispute Resolution Program Act (DRPA), the Court works with county-funded agencies, including the Los Angeles County Department of Consumer & Business Affairs (DCBA) and the Center for Conflict Resolution (CCR), to provide voluntary day-of-hearing mediation services for small claims, unlawful detainer, limited civil, and civil harassment matters. DCBA and CCR staff and trained volunteers serve as mediators, primarily for self-represented litigants. There is no charge to litigants. *For more information, visit https://dcba.lacounty.gov/countywidedrp.*

- **Temporary Judge Unlawful Detainer Mandatory Settlement Conference Pilot Program.** Temporary judges who have been trained as settlement officers are deployed by the Court to designated unlawful detainer court locations one day each week to facilitate settlement of unlawful detainer cases on the day of trial. For this program, cases may be ordered to participate in a Mandatory Settlement Conference (MSC) by judicial officers at Stanley Mosk, Long Beach, Compton, or Santa Monica. Settlement rooms and forms are available for use on the designated day at each courthouse location. There is no charge to litigants for the MSC. *For more information, contact the Court's ADR Office at ADRCivil@lacourt.org.*

# EXHIBIT 8

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**Civil Division**

Central District, Spring Street Courthouse, Department 1

**26STCV13931**
**KRISTIN BAKER, et al. vs HEALTHY WEB INC., et al.**

May 5, 2026
2:29 PM

Judge: Honorable Theresa M. Traber
Judicial Assistant: A. He
Courtroom Assistant: None

CSR: None
ERM: None
Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): No Appearances

For Defendant(s): No Appearances

**NATURE OF PROCEEDINGS:** Court Order Scheduling Initial Status Conference

By this order, the Court determines this case to be Complex according to Rule 3.400 of the California Rules of Court. The Clerk's Office has assigned this case to this department for all purposes.

Pursuant to Government Code Sections 70616(a) and 70616(b), a single complex fee of one thousand dollars ($1,000.00) must be paid on behalf of all plaintiffs. For defendants, a complex fee of one thousand dollars ($1,000.00) must be paid for each defendant, intervenor, respondent or adverse party, not to exceed, for each separate case number, a total of eighteen thousand dollars ($18,000.00), collected from all defendants, intervenors, respondents, or adverse parties. All such fees are ordered to be paid to Los Angeles Superior Court, within ten (10) days of service of this order.

By this order, the Court stays the case, except for service of the Summons and Complaint. The stay continues at least until the Initial Status Conference. Initial Status Conference is set for 08/17/2026 at 08:30 AM in this department. At least ten (10) days prior to the Initial Status Conference, counsel for all parties must discuss the issues set forth in the Initial Status Conference Order issued this date. Counsel must file a Joint Initial Status Conference Response Statement five (5) court days before the Initial Status Conference.

The Initial Status Conference Order, served concurrently with this Minute Order, is to help the Court and the parties manage this complex case by developing an orderly schedule for briefing, discovery, and court hearings. The parties are informally encouraged to exchange documents and information as may be useful for case evaluation.

Responsive pleadings shall not be filed until further Order of the Court. Parties must file a Notice of Appearance in lieu of an Answer or other responsive pleading. The filing of a Notice of Appearance shall not constitute a waiver of any substantive or procedural challenge to the Complaint. Nothing in this order stays the time for filing an Affidavit of Prejudice pursuant to

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**Civil Division**

Central District, Spring Street Courthouse, Department 1

**26STCV13931**
**KRISTIN BAKER, et al. vs HEALTHY WEB INC., et al.**

May 5, 2026
2:29 PM

Judge: Honorable Theresa M. Traber
Judicial Assistant: A. He
Courtroom Assistant: None

CSR: None
ERM: None
Deputy Sheriff: None

Code of Civil Procedure Section 170.6. Nothing in this order stays the filing of an Amended Complaint pursuant to Labor Code Section 2699.3(a)(2)(C) by a plaintiff wishing to add a Private Attorney General Act ("PAGA") claim.

Parties shall file all documents in conformity with Superior Court of Los Angeles County Local Rule 3.4, particularly the provisions requiring bookmarking (Local Rule 3.4(f)(2-5)).

For efficiency in communication with counsel, the complex program requires the parties in every new case to use an approved third-party cloud service that provides an electronic message board. In order to facilitate communication with counsel prior to the Initial Status Conference, the parties must sign-up with the e-service provider at least ten (10) court days in advance of the Initial Status Conference and advise the Court which provider was selected.

This Complex Courtroom does not use Los Angeles Superior Court's Court Reservation ("CRS") portal to reserve motion hearing dates. Rather, counsel may secure dates by calling the Courtroom Assistant at 213-310-70xx with the "xx" being the Department number, e.g. Dept. 1 is 01 and Dept. 10 is 10.

Court reporters are not provided for hearings or trials. The parties should make their own arrangements for any hearing where a transcript is desired.

If you believe a party or witness will need an interpreter, see the court's website for information on how to make such a request in a timely manner.
https://www.lacourt.ca.gov/pages/lp/language-access-services/tp/request-a-court-interpreter

Counsel are directed to access the following link for further information on procedures in the Complex litigation Program courtrooms: https://www.lacourt.ca.gov/pages/lp/civil/tp/civil-case-types-and-specialty-courtrooms/cp/complex-civil-litigation.

The plaintiff must serve a copy of this minute order and the attached Initial Status Conference Order on all parties forthwith and file a Proof of Service in this department within seven (7) days of service.

Certificate of Service is attached.

# EXHIBIT 9

FILED
Superior Court of California
County of Los Angeles
05/05/2026
David W. Slayton, Executive Officer / Clerk of Court
By: A. He Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

| | |
|---|---|
| KRISTIN BAKER and STACY PENNING, individually and on behalf of all others similarly situated,<br><br>Plaintiff(s),<br><br>v.<br><br>HEALTHY WEB INC. and NATURAL PARTNERS, INC., d/b/a FULLSCRIPT,<br><br>Defendant(s). | Case No.: 26STCV13931<br><br>**INITIAL STATUS CONFERENCE ORDER (COMPLEX CLASS ACTIONS)**<br><br>Case Assigned for All Purposes to Judge Theresa M. Traber<br><br>Department 1<br>Spring Street Courthouse |

This action has been designated as complex pursuant to CRC 3.400(a), and thus requires exceptional judicial management to carry out the purposes of that rule and to promote effective decision-making by the Court. This Initial Status Conference Order (Complex Class Actions) supplements a Minute Order served concurrently herewith. That Minute Order sets a date and time for the Initial Status Conference and includes many other important provisions which are NOT repeated in this Order. Counsel must review that Minute Order carefully to be fully informed of your obligations and the unique processes used in the Los Angeles Superior Court Complex Courtrooms.

Note: Some provisions of this Order are in reference to wage-and-hour class actions and may not be applicable to other types of class actions. Insofar as they are irrelevant to your case, say so in your Joint Initial Status Conference Response Statement.

Pending further order, the following is ordered:

The Court orders counsel to prepare for the Initial Status Conference ("ISC") by identifying and discussing the central legal and factual issues in the case. Counsel for plaintiff is ordered to initiate contact with counsel for defense to begin this process. Counsel then must negotiate and agree, as much as possible, on a case management plan. To this end, counsel must file a Joint Initial Status Conference Response Statement five (5) court days before the Initial Status Conference. The Joint Response Statement must be filed on line-numbered pleading paper and must specifically answer each of the below-numbered questions. Do not use the Judicial Council Form CM-110 (Case Management Statement).

1. **PARTIES AND COUNSEL:** Please list all presently-named class representatives and presently-named defendants, together with all counsel of record, including counsel's contact and email information.

2. **STATUS OF PLEADINGS:** Please indicate whether defendant has filed a Notice of Appearance or an Answer to the Complaint, and, if so, indicate the filing date(s).

3. **POTENTIAL ADDITIONAL PARTIES:** Indicate whether any plaintiff presently intends to add additional class representatives, and, if so, the name(s) and date by which these class representatives will be added. Indicate whether any plaintiff presently intends to name additional defendants, and, if so, the name(s) and date by which the defendant(s) will be added. Indicate whether any appearing defendant presently intends to file a cross-complaint and, if so, the names of cross-defendants and the date by which the cross-complaint will be filed.

4. **IMPROPERLY NAMED DEFENDANT(S):** If the complaint names the wrong person or entity, please explain why the named defendant is improperly named and the proposed procedure to correct this error.

5. **ADEQUACY OF PROPOSED CLASS REPRESENTATIVE(S):** If any party believes one or more named plaintiffs might not be an adequate class representative, including reasons of conflict of interest as described in *Apple Computer v. Superior Court* (2005) 126 Cal.App.4th 1253, please explain. No prejudice will attach to these responses.

6. **ESTIMATED CLASS SIZE:** Please discuss and indicate the estimated class size.

7. **OTHER ACTIONS WITH OVERLAPPING CLASS DEFINITIONS:** Please list other cases with overlapping class definitions. Please identify the court, the short caption title, the docket number, and the case status.

8. **POTENTIALLY RELEVANT ARBITRATION AND/OR CLASS ACTION WAIVER CLAUSES:** Please state whether arbitration is an issue in this case and attach any relevant document a plaintiff has signed or a sample of any relevant clause of this sort. Opposing parties must summarize their views on this issue.

9. **POTENTIAL EARLY CRUCIAL MOTIONS:** Opposing counsel should identify and describe the significant core issues in the case, and then identify efficient ways to resolve those issues, specifically considering the following:

- Motion to Compel Arbitration,
- Early motions in limine,
- Early motions about particular jury instructions and verdict forms,
- Demurrers,
- Motions to strike,
- Motions for judgment on the pleadings, and
- Motions for summary judgment and summary adjudication.

**10.** **CLASS CONTACT INFORMATION:** Counsel should discuss whether obtaining class contact information from defendant' s records is necessary in this case and, if so, whether the parties consent to an "opt-out" notice process (as approved in *Belaire-West Landscape, Inc. v. Superior Court* (2007) 149 Cal.App.4th 554, 561). Counsel should address timing and procedure, including allocation of cost and the necessity of a third party administrator.

**11. PROTECTIVE ORDERS:** Parties considering an order to protect confidential information from general disclosure should begin with the model protective orders found on the Los Angeles Superior Court Website under "Tools for Court Users and Attorneys."

**12. DISCOVERY:** Discovery is stayed until further order of the Court. Please discuss a discovery plan. If the parties cannot agree on a plan, summarize each side's views on discovery. The court generally allows discovery on matters relevant to class certification, which (depending on circumstances) may include factual issues also touching the merits. If any party seeks discovery from absent class members, please estimate how many, and also state the kind of discovery you propose[1].

13. **INSURANCE COVERAGE:** Please state if (1) there is insurance for indemnity or reimbursement, and (2) whether there are any insurance coverage issues which might affect settlement.

14. **ALTERNATIVE DISPUTE RESOLUTION:** Please discuss ADR and state each party's position about it. If pertinent, how can the court help to identify the best neutral and prepare the case for a successful settlement negotiation?

15. **TIMELINE FOR CASE MANAGEMENT:** Please recommend dates and times for the following:

- The next status conference,
- A schedule for alternative dispute resolution, if it is relevant,
- A filing deadline for the motion for class certification, and
- Filing deadlines and descriptions for other anticipated non-discovery motions.

16. **REMINDER WHEN SEEKING TO DISMISS:**

> **"**A dismissal of an entire class action, or of any party or cause of action in a class action, requires court approval. . . . Requests for dismissal must be accompanied by a declaration setting forth the facts on which the party relies. The declaration must clearly state whether consideration, direct or indirect, is being given for the dismissal and must describe the consideration in detail."[2]

---

[1] See California Rule of Court, Rule 3.768.
[2] California Rule of Court, Rule 3.770(a)

If the parties have settled the class action, that too will require judicial approval based on a noticed motion (although it may be possible to shorten time by consent for good cause shown).

17. **REMINDER WHEN SEEKING APPROVAL OF A SETTLEMENT:** To obtain approval of a class action settlement, the parties should strictly adhere to the Guidelines for Motions for Preliminary and Final Approval posted on the court's website under Tools for Litigators. See the link to same in the Minute Order served concurrently herewith. Plaintiff(s) must address any fee-splitting agreement in their motion for preliminary approval and demonstrate compliance with California Rule of Court 3.769 and the Rules of Professional Conduct 2-200(a) as required by *Mark v. Spencer* (2008) 166 Cal. App. 4th 219.

**18. REMINDER WHEN USING THE MESSAGE BOARD:** The court requires a pre-motion conference before any motion is filed, including discovery motions. Counsel shall jointly post a *brief s*tatement on the message board setting forth the discovery in dispute or the essential issue(s) to be decided in the motion. The court either will hold a prompt informal conference with the parties to discuss the dispute or tell the parties to call courtroom staff to obtain a motion date. If one side refuses to state its position in a joint posting after a reasonable request from opposing counsel, the opposing counsel may post a message unilaterally.

19. **NOTICE OF THE ISC ORDER:** Plaintiff's counsel shall serve this Initial Status Conference Order on all defense counsel, or if counsel is not known, on each defendant and file a Proof of Service with the court within seven (7) days of the date of this Order. If the Complaint has not been served as of the date of this Order, plaintiff(s) must serve the Complaint, along with a copy of this Order, within five (5) days of the date of this Order. Once served, each as yet non-appearing defendant shall file a Notice of Appearance (identifying counsel by name, firm name, address, email address, telephone number and fax number). The filing of a Notice of Appearance is without prejudice to (a) any jurisdictional, substantive or procedural challenge to the Complaint, (b) any affirmative defense, and (c) the filing of any cross-complaint in this action.

20. **e-SERVICE PROVIDER**: The parties should refer to the Court's website for the list of e-service providers which are approved for complex cases. The parties must sign up with the provider at

least ten days in advance of the Initial Status Conference and advise the Court, via email to sscdept1@lacourt.ca.gov, which provider was selected. While the parties are free to choose any approved service, Department 1 prefers CaseAnywhere.

Dated: May 5, 2026

Theresa M. Traber / Judge

Hon. Theresa M. Traber
Judge of the Los Angeles Superior Court

# EXHIBIT 10

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA**<br>**COUNTY OF LOS ANGELES** | FOR COURT USE ONLY<br><br>**FILED**<br>Superior Court of California<br>County of Los Angeles<br>05/05/2026<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: A. He Deputy |
| COURTHOUSE ADDRESS:<br>Spring Street Courthouse<br>312 North Spring Street, Los Angeles, CA, 90012 | |
| PLAINTIFF(S)/PETITIONER(S):<br>Kristin Baker, , et al. | |
| DEFENDANT(S)/RESPONDENT(S):<br>Healthy Web Inc., et al. | |
| **CLERK'S CERTIFICATE OF SERVICE**<br>**BY ELECTRONIC SERVICE** | CASE NUMBER:<br>26STCV13931 |

I, David W. Slayton, Executive Officer/Clerk of Court of the above-entitled court, do hereby certify that I am not a party to the cause herein and that on this date I served the

**Minute Order of 05/05/2026**
**Initial Status Conference Order of 05/05/2026**

upon each party or counsel of record in the above entitled action by electronically serving to the party or parties at the electronic address as listed below:

**"Jae K. Kim" <ekim@lcllp.com>,**
**"Tiffine E. Malamphy" <tiffine@lcllp.com>**

The electronic transmission originated from the Superior Court of California, County of Los Angeles email address eService-DoNotReply@lacourt.org at the Spring Street Courthouse, 312 North Spring Street, Los Angeles, CA, 90012.

Dated: 05/5/2026

David W. Slayton, Executive Officer / Clerk of Court

By: A. He
Deputy Clerk

# Exhibit 11

| | | |
|---|---|---|
| *Attorney or Party without Attorney:*<br>Jae K. Kim, Esq., Bar #236805<br>Lynch Carpenter LLP<br>9171 Towne Center Drive, Suite 180<br>San Diego, CA 92122<br>*Telephone No:* 619-762-1910<br>*Attorney for:* Plaintiff(s) | *Ref. No. or File No.:* | *For Court Use Only*<br>**Electronically FILED by Superior Court of California, County of Los Angeles 5/12/2026 9:58 AM David W. Slayton, Executive Officer/Clerk of Court, By G. Cordon, Deputy Clerk** |
| *Insert name of Court, and Judicial District and Branch Court:*<br>Los Angeles County Superior Court | | |
| *Plaintiff(s):* Kristin Baker, et l.<br>*Defendant:* Healthy Web, Inc., et al. | | |
| **AFFIDAVIT OF SERVICE Summons Complaint** | *Hearing Date:* / *Time:* / *Dept/Div:* | *Case Number:*<br>26STCV13931 |

1. *At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the Summons; Complaint; Notice of Case Assignment; Civil Case Cover Sheet; Civil Case Cover Sheet Addendum and Statement of Location; Alternative Dispute Resolution (ADR) Package; Minute Order; Initial Status Conference Order

3. *a. Party served:* Natural Partners, Inc. d/b/a Fullscript
   *b. Person served:* Tatiyana Smith, Authorized Agent, African American, Female, 26 Years Old, Black Hair, 5 Feet 7 Inches, 165 Pounds

4. *Address where the party was served:* The Corporation Trust Company
   1209 Orange Street
   Wilmington, DE 19801

5. *I served the party:*
   a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive process for the party (1) on: Wed., May. 06, 2026 (2) at: 9:14AM

6. *The "Notice to the Person Served" (on the Summons) was completed as follows:*
   *on behalf of:* Natural Partners, Inc. d/b/a Fullscript
   Under (corporation)

7. ***Person Who Served Papers:***
   a. Sean Snow
   **b. Class Action Research & Litigation**
   P O Box 740
   Penryn, CA 95663
   c. (916) 663-2562, FAX (916) 663-4955

*Fee for Service:* $262.45

I Declare under penalty of perjury under the laws of the State of DELAWARE that the foregoing is true and correct.

5-7-26 (Date) Sean Snow (Signature)

BRIAN JAMES SCHOFIELD MY COMMISSION EXPIRES NOV. 30, 2029 NOTARY PUBLIC STATE OF DELAWARE

8. ***STATE OF DELAWARE, COUNTY OF*** New Castle
   ***Subscribed and sworn to (or affirmed) before me on this*** 8 ***day of*** May ***by Sean Snow***
   ***proved to me on the basis of satisfactory evidence to be the person who appeared before me.***

(Notary Signature)

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

**PROOF OF SERVICE**

I, Michael Folger, declare:

I am employed in San Francisco County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 600 Montgomery Street, Suite 3100, San Francisco, CA 94111. On June 5, 2026, I served a copy of the within document(s):

**STIPULATION AND [PROPOSED] ORDER EXTENDING DEFENDANT'S DEADLINE TO RESPOND OR DEMUR TO PLAINTIFF'S COMPLAINT AND DEFENDANT'S DEADLINE TO MOVE TO STRIKE PORTIONS OF THE COMPLAINT**

☑ **VIA MAIL:** by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Francisco, California addressed as set forth below. I am personally and readily familiar with the business practice of Baker & Hostetler LLP for collection and processing of correspondence for mailing with the United States Parcel Service, and I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States Postal Service at San Francisco, California.

☑ **VIA EMAIL**: by transmitting via electronic mail the document(s) listed above to the e-mail address(es) set forth below on this date and the transmission was reported as complete and without error.

**SEE ATTACHED SERVICE LIST**

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on June 5, 2026, at San Francisco, California.

*/s/ Michael Folger*
Michael Folger

# MAILING LIST

**LYNCH CARPENTER, LLP**
(Eddie) Jae K. Kim (SBN 236805)
ekim@lcllp.com
Tiffine E. Malamphy (SBN 312239)
tiffine@lcllp.com
9171 Towne Centre Dr, Ste 180
San Diego, CA 92122
Telephone: (619) 762-1910
Facsimile: (858) 313-1850

*Attorneys for Plaintiffs*
KRISTIN BAKER and STACY PENNING, individually and on behalf of all others similarly situated

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES